[No. 38557. En Banc. May 5, 1966.]

THE STATE OF WASHINGTON, *on the Relation of John J. O'Connell, as Attorney General, Respondent,* v. STANLEY DUBUQUE *et al., Appellants.*\*

\*Reported in 413 P.2d 972.

*Paul P. Ashley* and *William H. Ellis, Jr.*, for appellants.

*M. L. Borawick* and *Parker & Borawick*, for appellant Hale.

*Edward J. Lehan*, pro se.

*The Attorney General, Harold T. Hartinger* and *J. Richard Duggan, Assistants*, for respondent.

HALE, J.—A curious fact of life in our democratic country is the heavy quantum of criticism and derision reserved by the people for their most representative institution, the legislature. Small wonder, then, that, when the 39th Session of the Washington State Legislature, having finished the monumental task of redistricting the state for the next general election, increased salaries for all representatives and new senators of the 40th Session from $100 to $300 per month, the enactment drew caustic comment from numerous sources and led to this suit to ascertain whether members of the 39th Legislature thereby forfeited their right to stand for re-election under the state constitution.

The 39th Session of the Legislature of the State of Washington, in Extraordinary Session, enacted Laws of 1965, Ex. Ses., ch. 127, § 4, increasing the annual salaries of all

legislators effective at the beginning of the term of office next following re-election. Section 5, noting possible constitutional ramifications, specifically refers to art. 2, §§ 13, 25; art. 4, § 13; and art. 28 of the state constitution and makes the act effective at the earliest time allowable under the constitution.[1] The enactment was signed into law by the Governor on April 8, 1965.

May 4, 1965, to initiate a constitutional test of this statute, the House and Senate adopted Senate Concurrent Resolution No. 26, reciting therein a number of declarations of fact which, in paraphrase, include *inter alia*:

1. A substantial number of members of the present legislature have a firm intention of filing for re-election to the legislature in July, 1966, for new terms commencing in January, 1967.

2. A majority of members of each house are in doubt whether the salary increase renders the entire membership ineligible for (a) the increased salary, or (b) re-election, or (c) both.

3. Unless these issues of eligibility for re-election and the amount of salary for the newly re-elected legislators are definitively adjudicated in advance of the July, 1966, period for filing declarations of candidacy for the September primary election, great confusion and uncertainty, will to the detriment of all the people, frustrate and thwart the orderly process of election.

The resolution concluded by requesting the Attorney General to take such action on behalf of the legislature as he deemed advisable for the purpose of obtaining answers to and resolution of the constitutional issues raised by the foregoing facts and events.

---

[1]Section 5 of Laws of 1965, Ex. Ses., ch. 127, reads:

"The salary increases provided for herein shall take effect at the earliest time allowable by the Constitution of the state of Washington, including Article II, section 13, Article II, section 25, Article IV, section 13, and Article XXVIII: PROVIDED, That it is the intent of the legislature that nothing in this act shall render a member of the legislature or of the judiciary ineligible to file for and be elected to the legislature or the judiciary respectively."

Thereupon, the Attorney General of the State of Washington, pursuant to Senate Concurrent Resolution No. 26, brought this suit for a declaratory judgment in the Superior Court for Thurston County, naming as parties defendant 14 county auditors and their respective prosecuting attorneys, the Secretary of State, and Mr. Robert I. Tenney as an elector and taxpayer of this state, who all gave notice of appearance and designated counsel of record. Further, Reid Hale, a citizen, elector and taxpayer residing in King County, appeared by counsel and filed his answer in intervention; and Edward J. Lehan, a citizen, elector and taxpayer and a member of the bar residing in Spokane County, was, on his application, named as an additional party defendant and subsequently allowed to change his status to that of intervenor.

In addition to the legislative declarations of fact set forth in the resolution, the Attorney General alleged further basis for jurisdiction: to determine in what amount the fee for filing declarations of candidacy for nomination to the legislature shall be collected by county auditors and the Secretary of State for the primary elections of September, 1966, and primary elections thereafter.[2] Filing fees are fixed at 1 per cent of the annual salary of the office to which the candidate seeks nomination.

From a summary judgment declaring in effect that (a) no member of the 39th Legislature is disqualified from seeking re-election by reason of the salary increase; (b) the increased compensation to $3,600 per annum shall take effect January 9, 1967, for all legislators whose terms commence on that date and on the second Monday in January,

---

[2] The complaint alleges that the "purpose of this action is":

"(a) To secure judicial confirmation that no member of the 39th Legislature of the State of Washington is disqualified to be or become a candidate for election to membership in the 40th Legislature by reason of the enactment of chapter 127, Laws of 1965, Ex. Sess., and operation of article 2, section 13, of the Washington Constitution.

"(b) To determine the fee that shall be paid pursuant to RCW 29.18.050 by all candidates for election to membership in the 40th Legislature when such candidates file their declarations of candidacy in accordance with RCW 29.18.040."

1969, for re-elected holdover Senators of the 40th Session whose new terms commence on this latter date; and (c) the filing fee to be paid by all candidates for the legislature and collected by the county auditors or Secretary of State for nomination to any term of office commencing on or after January 9, 1967, shall be $36, defendants and intervenors bring this appeal.

Appellants attack the judgment on a wide front, first urging a fatal jurisdictional deficiency in subject matter, contending that neither the pleadings nor facts create a justiciable controversy cognizable under the Declaratory Judgments Act (RCW 7.24) but rather call for a mere advisory opinion. They contend next that the courts are without jurisdiction to consider and rule upon the eligibility of members of the House and Senate because art. 2, § 8, of the Washington State Constitution, makes each house the "judge of the election, returns and qualifications of its own members." And, finally, if it be established that the courts do have jurisdiction of the cause and parties, appellants advocate, as a bar to the re-election of members of the 39th Legislature, art. 2, § 13, of the state constitution, which says that no member of the legislature shall be elected to any civil office in the state the emoluments of which have been increased during the legislator's term.

Do the pleadings and facts initiate a justiciable controversy under the Declaratory Judgments Act, RCW 7.24.020? The statute reads, in pertinent part:

A person . . . whose rights, status or other legal relations are affected by a statute . . . . may have determined any question of construction or validity arising under the . . . statute . . . and obtain a declaration of rights, status or other legal relations thereunder.

■ Although neither the constitution, nor RCW 7.24, *et seq.*, nor the court's inherent duty require the Supreme Court to render advisory opinions to the legislature, even on a direct request therefor, all courts should carefully consider legislative declarations of facts upon which a claimed controversy exists. The courts, without being bound thereby, should and do accord great respect to the official dec-

larations of that constitutional body, possessed as it is of the sovereign legislative power, that circumstances exist so genuinely affecting the rights of citizens and members of the legislature as to require in the public interest a decision of the Supreme Court of the state. Although we are not bound by the recitals set forth in the legislative request, we will not ignore the legislature's assertions of fact upon which the controversy is said to depend.

■ What are the principal elements of a justiciable controversy as contemplated by the Uniform Declaratory Judgments Act, RCW 7.24? First, a justiciable controversy requires parties having existing and genuine, as distinguished from theoretical, rights or interests. Second, the controversy must be one upon which the judgment of the court may effectively operate, as distinguished from a debate or argument evoking a purely political, administrative, philosophical or academic conclusion. Third, it must be a controversy the judicial determination of which will have the force and effect of a final judgment in law or decree in equity upon the rights, status or other legal relationships of one or more of the real parties in interest, or, wanting these qualities be of such great and overriding public moment as to constitute the legal equivalent of all of them. Finally, the proceedings must be genuinely adversary in character and not a mere disputation, but advanced with sufficient militancy to engender a thorough research and analysis of the major issues. Any controversy lacking these elements becomes an exercise in academics and is not properly before the courts for solution. The decisions of this court, when considered seriatim, recognize and apply this definition. *Hubbard v. Medical Serv. Corp.*, 59 Wn.2d 449, 367 P.2d 1003 (1962); *State ex rel. Ruoff v. Rosellini*, 55 Wn.2d 554, 348 P.2d 971 (1960); *Huntamer v. Coe*, 40 Wn.2d 767, 246 P.2d 489 (1952); *Adams v. Walla Walla*, 196 Wash. 268, 82 P.2d 584 (1938); *Washington Beauty College, Inc. v. Huse*, 195 Wash. 160, 80 P.2d 403 (1938); *Acme Finance Co. v. Huse*, 192 Wash. 96, 73 P.2d 341, 114 A.L.R. 1345 (1937).

Senate Concurrent Resolution No. 26, declaring that a substantial number of legislators of the 39th Session intend to file for re-election in July, 1966, for terms commencing in January, 1967—an assertion of fact supported inexorably by history of this commonwealth since statehood—makes of the legislators real parties in interest having actual rights to be determined. All electors, citizens, and public officials having to do with elections, are genuinely concerned with the amount of and from whom filing fees for declarations of candidacy shall be collected into the public treasury and what salary shall be paid to newly elected members of the 40th Legislature.[3] And, too, citizens who may be candidates for nomination to the legislature or electors voting at the next primary election have an authentic concern in learning whether incumbent legislators will be eligible for re-election.

That the controversy is one of importance to incumbent legislators seeking re-election, other candidates for the 40th Legislature, and electors of the state alike is so evident as to require no further discussion. Questions of salary, tenure, and eligibility to stand for public office, all being matters directly affecting the freedom of choice in the election process are of as much moment to the voters as they are to the candidates, and make this controversy one of public importance.

Lastly, we cannot ignore the pressure of time. If the test must await the filing of a declaration of candidacy, if we should rule as appellants suggest that no justiciable controversy exists until incumbent legislators seeking re-election file in July for nomination in the September primary, the courts will undoubtedly be confronted with cases brought after filings close in July and before the September election. Pressing, indeed, will be the need for final determination of such cases by the Supreme Court in time to allow the auditors of the affected counties to make up, print and distribute the ballots. Sound considerations of public policy invite a solution of the controversy now, well in

[3] See note 1, *ante* p. 555.

advance of the filing of declarations of candidacy and the printing of ballots for the 1966 primary elections. *Heavens v. King Cy. Rural Library Dist.*, 66 Wn.2d 558, 404 P.2d 453 (1965). Any other ruling compels the haste, confusion and uncertainty arising from the chronology of events in *State ex rel. Pennick v. Hall*, 26 Wn.2d 172, 173 P.2d 153 (1946).[4] The trial court correctly ruled this a justiciable controversy cognizable under the Uniform Declaratory Judgments Act, RCW 7.24.

The next question likewise concerns the problem of jurisdiction. Under the state constitution, do the courts have power to decide the eligibility of members of the legislature to file for nomination to succeeding terms?

Article 2, § 8, of the Washington State Constitution declares:

> Each house shall be the judge of the election, returns and qualifications of its own members . . . .

Appellants contend that this provision makes the House of Representatives and the Senate the *exclusive* judges of the election, returns and qualifications of their own members respectively, and totally deprives the courts of jurisdiction to inquire into and pass judgment upon the eligibility of a candidate, nominee or elected member of either house. They describe this as a total want of jurisdiction extending to primary as well as to final general elections. Despite the superb scholarship and advocacy[5] brought to bear on this

---

[4] *State ex rel. Pennick v. Hall, supra,* illustrates the pressure of events to obtain a definitive ruling in a case commenced after the primary election in September and before the general election in November, and shows the need for time to study all of the issues both at trial and on review. In the Supreme Court, the case was argued only 2 days after respondent's brief had been filed and the majority and dissenting opinions were filed on the very day of oral argument.

[5] We apprehend grave danger to our democratic institutions if it be the inexorable rule that, without regard to concepts of fair play and due process of law, the House and Senate of either the State Legislature or the Congress have exclusive jurisdiction to disqualify and unseat members thereof and that the courts are completely powerless in the premises. Conceding the separation of powers to be one of the keystones of freedom, we note among other dangers that, should the courts be deemed

proposition by appellants, we need not and, therefore, do not pass upon the issue of whether the House and Senate are the *exclusive* judges of the election, qualifications and returns of their own *members*, for that question is not now before us. Our instant concern is with the *primary* elections of July, 1966, and July, 1968.

█ Early in the history of primary elections, we said that the courts have the power to rule upon questions of candidacy. In *State ex rel. McAvoy v. Gilliam*, 60 Wash. 420, 423, 111 Pac. 401 (1910), passing directly on whether the courts have jurisdiction to determine the qualifications of candidates in a primary election, this court said:

> Under the constitution each house of the legislature shall be the final judge of the election returns and qualifications of its own members. Const., art. 2, § 8. But this does not prevent the legislature from providing a method of nominating and electing candidates for office.
>
> We are therefore of the opinion that the court has jurisdiction both of the subject-matter and of the person of the relator. The writ must therefore be denied.

Later, on the authority of this very case, in a situation where the trial judge held he was without jurisdiction under the state constitution, art. 2, § 8, to prohibit the county auditor from printing the name of a candidate for nomination to the State Senate on the primary election ballot, we reversed, saying in *State ex rel. O'Neil v. Todd*, 45 Wn.2d 206, 273 P.2d 665 (1954):

> We are of the opinion that the court was in error in holding that it was without jurisdiction to decide whether the auditor had the authority to print the name of Orlyn Haws on the ballot. The jurisdiction of the court to determine such question is derived from RCW 29.04.030. The statute is a part of the legislation providing a method of nominating candidates for public office, to which § 8,

utterly without jurisdiction, one political party can, if ruthlessly bent upon destruction of its opposition, disqualify and unseat all of its opposing members. The instant case, however, involves eligibility to file for nomination at a primary election; we are not asked to decide whether the courts have judicial power to review the ouster of a member of the House or Senate.

Art. II, of the constitution does not apply. *State ex rel. McAvoy v. Gilliam,* 60 Wash. 420, 111 Pac. 401.

Then, in *Defilipis v. Russell,* 52 Wn.2d 745, 328 P.2d 904 (1958), although not discussing the question of jurisdiction, but proceeding directly to the substantive issues, this court definitively ruled on the matter of eligibility to file a declaration of candidacy in a primary election. That case held that a candidate for nomination to the office of State Representative at the primary election, although a resident of the legislative district, was not qualified to run for nomination because he was not a registered voter. Our affirmance sustained the decree which held the declaration of candidacy null and void and enjoined the county auditor from printing the candidate's name on the primary election ballot.

*State ex rel. Boze v. Superior Court,* 15 Wn.2d 147, 129 P.2d 776 (1942), does not seem to fall outside the rationale of the foregoing cases. There, relator challenged the candidacy for the State Senate of Major General David L. Stone, U.S. Army (Ret.), on the grounds that, being a retired army general, he was ineligible to membership in the legislature under art. 2, § 14, of the state constitution, a provision declaring that no person holding a United States military office is eligible to be a member of the legislature. Despite language tending to sustain appellants' position, the case gives superficial if any real support to their thesis because the inquiry came too late to invoke an authoritative disposition of the jurisdictional problem.

General Stone had already won the primary of September 8, 1942, and was entitled to formal notice of his nomination as the Democratic Party candidate at the November 3, 1942, general election. After the primary, on September 26, 1942, relator filed his amended petition to nullify the nomination. Thus, the primary election had been held when the plaintiff sought to prevent respondent from not only filing his declaration of candidacy, but also standing for nomination and running in the final election. Our affirmance did not mean that the courts may not inquire into primary elections but rather that, because relator had not brought his case in time

to resolve the issues well in advance of the primary, no relief should be granted.

Nor should it be overlooked that, in the election code, RCW 29.04.030 specifically vests jurisdiction in the Supreme and superior courts, *inter alia,* to order the correction of any error or omission that "has occurred or is about to occur" in printing the name of any candidate on official ballots, or to cure the error or wrong where "(3) The name of any person has been or is about to be wrongfully placed upon the ballots." *State ex rel. Pennick v. Hall,* 26 Wn.2d 172, 173 P.2d 153 (1946), although of doubtful authority on other points, applies this statute in holding that the courts have power to hear and decide actions questioning the eligibility of a candidate for public office.

We therefore conclude that art. 2, § 8, of the state constitution, making each house the judge of the election, returns and qualifications of its own members, does not divest the courts of jurisdiction to hear and decide questions respecting the election, returns and qualifications of candidates at the primary election. The trial court, accordingly, had jurisdiction to try and to decide upon the eligibility of members of the 39th Legislature whose terms expire in January, 1967, to file their declaration of candidacy in July, 1966 (RCW 29.18.040), for the September, 1966, primary, and members of the Senate whose terms expire in January, 1969, to file declaration of candidacy in July, 1968, for the September primaries of 1968. Accord: *Leu v. Montgomery,* 31 N.D. 1, 148 N.W. 662 (1914); *State ex rel. Cloud v. State Election Bd.,* 169 Okla. 363, 36 P.2d 20, 94 A.L.R. 1007 (1934); *State ex rel. Beck v. Erickson,* 175 Minn. 393, 221 N.W. 245 (1928); *State ex rel. McGrath v. Erickson,* 203 Minn. 390, 281 N.W. 366 (1938); *State ex rel. Gramelspacher v. Martin Circuit Court,* 231 Ind. 114, 107 N.E.2d 666 (1952).

This brings us to the merits. Are the members of the 39th Legislature by reason of the increase in legislative salaries barred from re-election to the legislature for the term next succeeding the term now being served by them because of art. 2, § 13, of the Washington State Constitution? The section declares:

No member of the legislature, during the term for which he is elected, shall be appointed or elected to any civil office in the state, which shall have been created, or the emoluments of which shall have been increased, during the term for which he was elected.

Article 2, § 1, of the state constitution, creates the legislature, making it a bicameral body. Article 2, §§ 2, 4, 5 and 6 prescribe the size, composition, and the terms of the House and Senate respectively. Under the constitution, as originally adopted, art. 2, § 23, fixed compensation for legislators at $5 per day for each day of attendance and allowed reimbursement for travel at 10 cents per mile:

Each member of the legislature shall receive for his services five dollars for each day's attendance during the session, and ten cents for every mile he shall travel in going to and returning from the place of meeting of the legislature, on the most usual route.

Presumably the legislature could not constitutionally change this salary. In 1948, art. 28, the 20th Amendment, empowered the legislature to fix the compensation of all elected state officials, expressly amending art. 2, § 23, by way of the following language:

All elected state officials shall each severally receive such compensation as the legislature may direct. The compensation of any state officer shall not be increased or diminished during his term of office, except that the legislature, at its thirty-first regular session, may increase or diminish the compensation of all state officers whose terms exist on the Thursday after the second Monday in January, 1949.

The provisions of sections 14, 16, 17, 19, 20, 21, and 22 of Article III and section 23 of Article II in so far as they are inconsistent herewith, are hereby repealed.

The people of the state, in the exercise of their sovereign power to amend the constitution, thus vested in the legislature the authority to fix salaries of all elected state officials, including members of the House and Senate. In exercising this power granted them by the 20th Amendment, did the members of the legislature, including those who may have

voted against the salary increase, forfeit their right to stand for re-election to the term beginning at the expiration of the term now being served?

Appellants, under the language of art. 2, § 13, forbidding members from being appointed or elected to a civil office the emoluments of which have been increased during the term for which the legislator was elected, insist that the answer must be yes, and, *inter alia,* point to *State ex rel. Pennick v. Hall, supra,* as a determinative ruling in support of that answer. Respondent meets this argument by likewise referring to the express language of art. 2, § 13, and urging that the Pennick case was hurriedly and inadvisedly argued and decided, with inadequate time for reflection and research and cites *State ex rel. Carroll v. Munro,* 52 Wn.2d 522, 327 P.2d 729 (1958), as better-reasoned and a more recent, authoritative and cogent declaration of law on the subject, impelling a negative answer. *State ex rel. Ryan v. Boyd,* 21 Wis. 210 (1866), cited by the majority and dissenting opinions in *Pennick,* seems to give strong support to respondent's position.

In *Pennick, supra,* six judges of this court held that Blanche Pennick, having been a member of the 29th Session of the Washington State Legislature for a term expiring the second Monday in January, 1947, was not eligible for election to the office of Auditor of Grays Harbor County for a new term beginning the second Monday in January, 1947, on the grounds that the 29th Legislature of which Mrs. Pennick had been a member had increased the salaries of county auditors from $2,400 to $3,600, commencing with the new term on the second Monday in January, 1947. Two judges dissented, but all agreed that the courts had jurisdiction to decide the question.

Subsequently, we had occasion to take another look at the problem in *State ex rel. Carroll v. Munro, supra,* and, despite a number of rather subtle distinctions—some so fine as to be nearly imperceptible—came to what seems in principle to be an opposite conclusion. In *Munro, supra,* Mr. Ed Munro had been a member of the 35th Session of the Washington State Legislature, which had increased the salaries

of King County Commissioners from $8,600 to $12,000 for terms commencing subsequent to June 12, 1957, the effective date of the act. King County Commissioner Sears, whose elected term ran from January 14, 1957, to the second Monday in January, 1961, died April 7, 1958, and the Governor shortly thereafter appointed Mr. Munro to serve out the unexpired term, that is, to serve until the second Monday in January, 1961—a term of office which would not receive the increased salary. Altogether five judges accepted Judge Ott's views sustaining Mr. Munro's eligibility for both the appointment and succeeding election to the new term when, in a partly concurring and partly dissenting opinion, he wrote:

> I dissent to that portion of the majority opinion which holds that Mr. Munro is *not eligible* for the office by virtue of Art. II, § 13, of the constitution. The unexpired term of Commissioner Sears, deceased, does not carry with it the increased emoluments which the constitution forbids Mr. Munro to receive. He will not receive the increased emoluments unless he is re-elected for the term commencing in 1961. By authority of our previous decisions of *State ex rel. Todd v. Reeves,* 196 Wash. 145, 82 P. (2d) 173, 118 A.L.R. 177 (1938), and *State ex rel. Pennick v. Hall,* 26 Wn. (2d) 172, 173 P. (2d) 153 (1946), Mr. Munro is eligible to hold the office.

A strong public policy exists in favor of eligibility for public office, and the constitution, where the language and context allows, should be construed so as to preserve this eligibility. *State ex rel. Weston v. Schragg,* 158 Wash. 74, 291 Pac. 321 (1930). The *Munro* decision applied this principle; *Pennick* ignored it. *Munro* carried out a policy favoring eligibility while, at the same time, reserving to the voters their final decision at the polls whether Mr. Munro should receive the increased salary. Mr. Munro would not receive the increased salary during the term for which he was *appointed* county commissioner; nor would he receive the increase thereafter during *any part of the term for which he had been elected to the legislature.* His right to receive the increase depended entirely upon his

election by the people *for a term which did not overlap his legislative term of office.*

Of the two cases, *Munro,* when considered in the light of the twice-used language of art. 2, § 13, expressly limiting the limitation therein to the legislator's *term for which he is or was elected,* seems more compatible with strong policy favoring eligibility for public office and fosters the idea of reserving for the people a greater freedom of choice in elections.

Article 2, § 13, of the state constitution, is designed in part to prevent a member of the legislature from increasing the salaries of public officials and then, during the term for which he was elected legislator, maneuvering to obtain the increased salary without an intervening election. But the words of limitation describe only the legislator's term of office. If the office be elective, then the legislator should have the right to stand for election to it in common with all other citizens of the state when the term receiving the increased salary does not substantially overlap the legislative term. One of the main purposes of the constitutional provision will be assured, in the case of elected officials, if the electorate have an opportunity to pass upon the legislator's actions in increasing public salaries and to exercise their judgment upon him at the polls. The provision has other purposes too, as is so clearly expressed by Mr. Justice Story, Story on the Constitution § 867 (1891), and referred to in the dissenting opinion of Connelly, J., in *State ex rel. Pennick v. Hall, supra,* and the partly concurring and partly dissenting opinion per Rosellini, J., in *State ex rel. Carroll v. Munro, supra,* as follows:

> The reasons for excluding persons from offices who have been concerned in creating them, or increasing their emoluments, are to take away, as far as possible, any improper bias in the vote of the representative, and to secure to the constituents some solemn pledge of his disinterestedness. The actual provision, however, does not go to the extent of the principle, *for his appointment is restricted only "during the time for which he was elected," thus leaving in full force every influence upon his mind, if the*

*period of his election is short or the duration of it is approaching its natural termination.* (Italics ours.)

If, however, art. 2, § 13, has the meaning appellants ascribed to it, then any member of a session which raised the salaries of any public office, including legislative office, could conceivably be forever barred from election to any such office. We doubt that the people of this state in adopting the 20th Amendment, which vested in the legislature the power and the duty to prescribe the salaries of all state officials, contemplated so bizarre a consequence. And there are other mischievous consequences to appellants' thesis. Appellants' interpretation of art. 2, § 13, would also permit a majority party in the legislature to disqualify among the legislators many leading candidates for high state office, including those for Governor and Attorney General, by simply raising the salary of the office sought to be denied.

Common sense indicates that, when the people, through the 20th Amendment, imposed on the legislature the duty to fix state salaries, they did not intend to substantially erase the legislator's eligibility to stand for re-election. They intended merely that, if the legislator's term of office and the term for which the greater salary will be received coincide or substantially overlap, then the legislator would be ineligible. But if the term drawing the increased salary begins at the end of the legislator's term, then the salary *will not have been increased during the term for which he was elected to the legislature.* Expressed another way, where the salary increase does not take effect during the term for which the legislator was elected to the legislature, he is not ineligible to stand for election to and serve in an office at a higher salary commencing with the expiration of his elected term as legislator, because no part of the increase will be earned during the legislator's incumbent term of office.

We favor an interpretation tending to unfetter the process of election as more in keeping with democratic ideals than a construction which inclines to curtail the freedom to stand for office. Despite the criticism and com-

plaints frequently directed by the people toward their legislature, that body remains the single most democratic organ of constitutional government yet devised, reflecting with greater clarity and frequency probably than any of our institutions—save possibly the public schools—the will and aspirations of a free people. From this academy of free representative government have come some of our greatest presidents, ablest jurists, most capable members of the Congress, and outstanding statesmen. Perhaps no greater school exists for the training of men to leadership in a democracy than service in a state legislature. The constitution, ought, therefore, where its language is susceptible of many meanings, be construed to augment and foster rather than curb and curtail the elective process. Eligibility should be presumed rather than be denied.[6] *State ex rel. Johnson v. Nye,* 148 Wis. 659, 135 N.W. 126 (1912); *State ex rel. Hawthorne v. Wiseheart,* 158 Fla. 267, 28 So.2d 589 (1946); *State ex rel. Weston v. Schragg,* 158 Wash. 74, 291 Pac. 321 (1930).

*State ex rel. Pennick v. Hall, supra,* although adhered to on the point involving jurisdiction is, as to the holding which denied relator eligibility, accordingly, overruled.

We therefore conclude that members of the House of Representatives and the Senate of the State of Washington whose present terms of office expire in January, 1967, are not disqualified from filing declarations of candidacy in July, 1966, for nomination and election to the 40th Session of the Washington State Legislature, and all members of the Senate whose present terms expire in January, 1969, are not disqualified from filing declarations of candidacy in July, 1968, for nomination and election to the 41st Session by reason of Laws of 1965, Ex. Ses., ch. 127, and art. 2, § 13, of the state constitution. The salary for members of the House and Senate whose new terms commence in January, 1967, and for holdover Senators elected for new terms beginning in January, 1969, shall be $3,600, effective with the

---

[6]See opinion concurring in part and dissenting in part per Rosellini, J., in *State ex rel. Carroll v. Munro,* 52 Wn.2d, at 540.

commencement of such terms and the filing fee for declarations of candidacy shall be $36.

We have considered the other assignments of error, and they appear to be without merit. In accordance with the views expressed herein, the judgment is affirmed.

ROSELLINI, C. J., FINLEY, OTT, HUNTER, and HAMILTON, JJ., concur.

DONWORTH and WEAVER, JJ., concur in the result.

HILL, J. (dissenting)—I dissent. The majority and I both start with the same constitutional provision for construction:

> No member of the legislature, during the term for which he is elected, shall be appointed or elected to any civil office in the state, which shall have been created, or the emoluments of which shall have been increased, during the term for which he was elected. Const. art. 2, § 13.

We arrive at widely disparate results.

I am in accord with much that is said in the course of the elaborate argument[7] by which the majority arrives at its construction.

I agree with the majority that there is a justiciable controversy which we ought to decide now. I agree with the

---

[7]Since this argument so largely hinges on *State ex rel. Carroll v. Munro,* 52 Wn.2d 522, 327 P.2d 729 (1958), which is hailed as a repudiation of *State ex rel. Pennick v. Hall,* 26 Wn.2d 172, 173 P.2d 153 (1946), I would like to point out that everything that was said in *Carroll v. Munro, supra,* about Mr. Munro's eligibility or noneligibility to be a county commissioner, by reason of his having been a member of the legislature which raised the salary of that office, was dicta. All that the case held was that Mr. Munro had no right to hold the office of county commissioner. His appointment by the Governor was set aside because the legislature had acted unconstitutionally in attempting to confer on the Governor the authority to fill a vacancy on a three-member board of county commissioners, when there were two commissioners qualified and functioning as a board. That was decisive of the case, and all that was decided. In my opinion the *Pennick* case is squarely in point and was properly decided. We there relied strongly on *State ex rel. Reynolds v. Howell,* 70 Wash. 467, 126 Pac. 954 (1912), and its construction of the "term for which he was elected." For all practical purposes our holding in that case determined who was to be elected Governor of the state in 1912. That opinion, the majority ignores.

strong policy favoring eligibility for public office, which they express. I agree wholeheartedly with the majority that the legislature

> remains the single most democratic organ of constitutional government yet devised, reflecting with greater clarity and frequency probably than any of our institutions—save possibly the public schools—the will and aspirations of a free people. From this academy of free representative government have come some of our greatest presidents, ablest jurists, most capable members of the Congress, and outstanding statesmen. Perhaps no greater school exists for the training of men to leadership in a democracy than service in a state legislature.

And frankly, I see no harm or injury to our society, and no dangers rushing in to imperil the state, if the members of the legislature which increased legislative salaries are permitted to be candidates for re-election during the term in which they increased the emoluments of the office.[8] The whole point is, despite all that has been said in the majority opinion, that the quoted constitutional provision says the members of the legislature shall not be *elected* or appointed to a civil office during the term for which they have been elected, the emoluments of which they have increased during the term for which they have been elected.

The 39th Legislature raised the salary to be paid members of the legislature from $1,200 to $3,600 a year, and if § 13, art. 2 of the constitution does not prohibit the members of that legislature from being elected to the legislature in 1966 (or 1968, in the case of hold-over Senators), *i.e.*, during the term for which they were elected, it does not prohibit anything, and makes of it a choice bit of nonsense. Whether it was a wise provision when adopted, or whether it is a

---

[8]Indeed, I can see great loss to the state if experienced legislators were not permitted to be candidates. That unfortunately is not the question—but rather: does the constitution permit them to be candidates under the circumstances here existing. There would still seem to be an alternative if the loss of their services for a session is deemed to be irreparable—a special session could be called, and the salary increase could be repealed, thus removing the bar to the candidacy of the present legislators.

wise provision now, are debatable issues; but beyond debate, the constitution still reads:

> No member of the legislature, during the term for which he is elected, shall be appointed or elected to any civil office in the state, which shall have been created, or the emoluments of which shall have been increased, during the term for which he was elected. Const. art. 2, § 13.

On page 568 of the majority opinion, it is said:

> But if the term drawing the increased salary begins at the end of the legislator's term, then the salary *will not have been increased during the term for which he was elected to the legislature.* (Emphasis by the majority.)

This is a play on words. No one can say, "Look the 39th Legislature didn't increase the salaries because the increase didn't take effect during the term for which they were elected." If the 39th Legislature did not increase the salary, what legislature did—the 38th or the 40th?

Further it seems to me to miss the point entirely. True it satisfies the requirement of Const. art. 2, § 25, that no compensation of any public officer shall be increased during his term of office; but we are not here concerned with when the increase becomes effective, but with whether a member of the legislature that increased the emoluments of a certain office, can be appointed or *elected* to that office during that legislative term. The constitution says, *no.*

The 39th Legislature increased the emoluments for legislators. Any member of the 39th Legislature, except a holdover Senator, who seeks to be a member of the 40th Legislature must be elected in 1966. Any such member elected in 1966 would necessarily be elected during his term of office as a member of the 39th Legislature.

---

August 2, 1966. Petition for rehearing denied.