[No. 42879.    En Banc.    September 12, 1974.]

MILDRED E. BARE, *Respondent*, v. SLADE GORTON, *as Attorney General, et al., Appellants.*

*Slade Gorton, Attorney General, Malachy R. Murphy, Deputy, Wayne L. Williams, Robert F. Hauth,* and *James M. Vache, Assistants,* and *Richard D. Emery,* for appellants.

*Davis, Wright, Todd, Riese & Jones* and *Stephen K. Eugster,* for respondent.

BRACHTENBACH, J.—This is an action for declaratory judgment in which plaintiff seeks to have declared unconstitutional section 14 of Initiative 276, codified as RCW 42.17.140. Section 14 imposes spending limitations on campaign expenditures in any election campaign for public office or in connection with ballot propositions.[1] Plaintiff is a resident of the Marysville school district and cotreasurer of a "levy pass committee" which was designed to gain support for a special levy election in that school district.

The Public Disclosure Commission, which is charged with administration of the initiative, intervened as did a private citizen who had made a citizen's complaint against plaintiff under the provisions of section 40(4), RCW 42.17.400(4), of the initiative.

The trial court held section 14 in its entirety unconstitutional. We affirm.

We first answer defendants' challenge to plaintiff's standing to maintain this suit which was brought as an individ-

---

[1] "42.17.140. Campaign expenditure limitations. (1) The total of expenditures made in any election campaign in connection with any public office shall not exceed the larger of the following amounts:

"(a) Ten cents multiplied by the number of voters registered in the constituency at the last general election for the public office; or

"(b) Five thousand dollars; or

"(c) A sum equal to the public salary which will be paid to the occupant of the office which the candidate seeks, during the term for which the successful candidate will be elected: *Provided,* That with respect to candidates for the office of governor and lieutenant governor of the state of Washington only, a sum equal to the public salary which

will be paid the governor during the term sought, multiplied by two; and with respect to candidates for the state legislature only, a sum equal to the public salary which will be paid to a member of the state senate during his term.

"(2) In any election campaign in connection with any state-wide ballot proposition the total of expenditures made shall not exceed one hundred thousand dollars. The total of such expenditures in any election campaign in connection with any other ballot proposition shall not exceed ten cents multiplied by the number of voters registered in the constituency voting on such proposition."

ual rather than as a class action. Plaintiff's standing is so clear that little discussion is needed to substantiate its viability.

There is no doubt that the "levy pass committee" in the Marysville school district is a political committee within the definition of RCW 42.17.020(22). Plaintiff was cotreasurer of that committee, and there are specific duties imposed upon her as such regarding deposits, records and expenditures. RCW 42.17.050-.080. Indeed, no expenditure can be made by a political committee except on authority of the campaign treasurer (or a candidate which is not here involved). Under RCW 42.17.390 a person violating the act is subject to civil penalties ranging from $10 per day, for failure to file a complete or timely report, to $10,000 for each violation, as well as an amount equal to any contribution or expenditure which is not reported.

Thus, plaintiff's interest is hardly theoretical and abstract as defendants claim. In fact, the intervening private citizen has filed demand on the Attorney General to take action against plaintiff for violation of the act and, in addition, gave notice of his intent to bring a citizen's action under RCW 42.17.400(4) if the Attorney General fails to proceed. Plaintiff therefore meets the requirements of standing as enunciated in *Sorenson v. Bellingham,* 80 Wn.2d 547, 496 P.2d 512 (1972).

Next it is argued that plaintiff failed to exhaust her administrative remedies. The Public Disclosure Commission does have authority to provide certain relief from some requirements of Initiative 276, but only as provided in RCW 42.17.370(7) and (9). Subsection (7) authorizes an exemption of general applicability, but the scope is limited to campaigns involving less than $1,000 and is not applicable in this particular case since that sum had been exceeded by the levy committee. Subsection (9) is also not applicable because it authorizes the commission only to suspend or modify the *reporting* requirements and not to modify spending limitations.

Therefore, plaintiff has no administrative remedy to

exhaust. Even if such a prior remedy were available, such a course of action is unnecessary where the issue raised is the constitutionality of the very law sought to be enforced. An administrative body does not have authority to determine the constitutionality of the law it administers; only the courts have that power. *United States v. Kissinger,* 250 F.2d 940 (3d Cir. 1958); *cert. denied,* 356 U.S. 958, 2 L. Ed. 2d 1066, 78 S. Ct. 995 (1958). 3 K. Davis, *Administrative Law Treatise* § 20.04, at 74 (1958).

Turning to the merits, we are faced at the outset with serious questions about the section's meaning and its operation. Section 14(2) establishes limits for every election campaign for and against any ballot proposition. While this scheme seems simple enough in the abstract, it poses intractable problems of administration and enforcement. Several hypothetical but realistic examples prove the point:

First, who decides and what standards are to be used in determining whether a particular communication is for or against a proposition? Imagine an avdertisement which states "If you believe you should raise your taxes for a teacher salary increase, vote for the special levy." The act provides no standards to determine how to allocate the cost of that message as for or against the proposition.

Second, nonpartisan "neutral" messages may have a substantial influence by dissemination of information without favoring or opposing the measure. Apparently there is no limit applicable.

Third, expenditures which are limited include "contributions." RCW 42.17.020(12). In turn, contributions include personal services for less than full consideration but do not include the rendering of "part-time" personal services of the sort commonly performed by volunteer campaign workers. "Part-time" services is defined as services in addition to regular full employment, or, in the case of an unemployed person, services not in excess of 20 hours per week, excluding weekends. RCW 42.17.020. Thus, an unemployed person is limited in contributing personal services to 4

hours a day during the 5-day week, while a person employed part-time has no limitation.

Fourth, the record discloses that several groups have been active in promoting or opposing special levies in the Marysville district. Who violates the law if their combined expenditures exceed the limit? The act provides no answer.

Fifth, looking at the limits on candidates, what if a political party by paid advertisements urges voters to vote for all candidates of that party? Such communications could have a substantial impact on voters, but the act does not provide how the expenditures are to be allocated if at all.

Sixth, a candidate has a right to communicate effectively with his constituency, but apparently he could be silenced altogether if a committee over which he has no control has spent the maximum on his behalf. The problem is aptly illustrated by Professor Rosenthal's posing of a hypothetical of a committee promoting a slogan: "We admit he's pretty terrible, but he's the best of a bad lot." A. Rosenthal, *Federal Regulation of Campaign Financing: Some Constitutional Questions.* Citizens Research Foundation Study No. 18 (1972).

Finally, since the last expenditure report is filed 5 days before the election, persons spending during the critical days before an election do so at their peril since they have no means of knowing accurately what other sums are being spent and by whom.

With reference to the facts in the present case, defendants assert that section 14 does not apply to *individual* expenditures, not made through a committee, if less than $100 in aggregate amount, and that only direct expenditures in excess of $100 are counted toward the limitation of section 14. There is, however, nothing in section 14 which so qualifies the operation of the limitation. Indeed, defendants concede that if a committee had actual knowledge of direct expenditures in amounts less than $100, such amounts would probably count toward the limit. Defendants attempt to bolster their argument with the contention

that a campaign necessarily implies a shared purpose through an organized effort subject to control or coordination. In essence they say that there must exist a committee of some sort before there is a campaign. However, a campaign can be simply a series of unrelated operations or efforts directed toward influencing the public to support a particular candidate, political party or measure. Nothing in the act states, directly or by implication, that only committee-run efforts constitute a campaign. If defendants' theory is carried to its logical conclusion a candidate who had no committee would escape the limitations of the act.

It is evident that a person who wishes to avoid violating the provisions of section 14 faces substantial and unresolved issues of meaning and application. The rights involved with respect to the limitations imposed by section 14 are derived from the First Amendment. Such rights, it must be remembered, are "delicate and vulnerable, as well as supremely precious in our society." *NAACP v. Button,* 371 U.S. 415, 433, 9 L. Ed. 2d 405, 83 S. Ct. 328 (1963). First Amendment rights are not to be abridged or even chilled by statutory vagueness. *Baggett v. Bullitt,* 377 U.S. 360, 12 L. Ed. 2d 377, 84 S. Ct. 1316 (1964). Any legislative impingement on these rights must be drawn with precision and narrow specificity. *Keyishian v. Board of Regents,* 385 U.S. 589, 17 L. Ed. 2d 629, 87 S. Ct. 675 (1967). Section 14 is impermissibly vague.

Even were there not these problems as to what the law requires and how it operates, section 14 is fatally defective because it can operate to prohibit absolutely plaintiff and others from exercising their constitutionally guarantied freedom of speech. The defendants argue that the section merely imposes a regulation on the amount of money which can be spent in communicating. However, freedom of speech and press involve more than the bare right to speak and publish. To say otherwise is to ignore reality. To communicate effectively with the mass of voters, one cannot be limited to verbal communication, person-to-person, but must use the media in one form or another. The protected

rights include dissemination, distribution and the correlative rights of the public to receive such expressions of opinion. *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 23 L. Ed. 2d 371, 89 S. Ct. 1794 (1969).

> The right of freedom of speech and press includes not only the right to utter or to print, but the right to distribute, the right to receive, the right to read . . .

*Griswold v. Connecticut*, 381 U.S. 479, 482, 14 L. Ed. 2d 510, 85 S. Ct. 1678 (1965).

If a committee, indeed if one person, has spent the maximum allowable in favor of a levy, plaintiff is absolutely barred from any communication which involves an expenditure, even the contribution of personal services beyond the statutory minimum. The same would be true of every other person in the school district. Furthermore, section 14 is so restrictive that plaintiff cannot even mail a letter with first class postage to each voter since the stamp alone equals the limitation.[2] These First Amendment freedoms cannot be so trammeled upon. Both in terms of the potential of absolute prohibition and for lack of narrow regulation drawn with precision and specificity, section 14 is unconstitutional. *Keyishian v. Board of Regents, supra; Lovell v. Griffin*, 303 U.S. 444, 82 L. Ed. 949, 58 S. Ct. 666 (1938).

■ Defendants argue as a matter of policy that one of the overriding and, therefore, justifying purposes of the act is to prevent moneyed interests from drowning out the voices of the less affluent. We acknowledge the State's interest in promoting an open, honest and effective electoral process. We held in *State v. Conifer Enterprises, Inc.*, 82 Wn.2d 94, 508 P.2d 149 (1973), that such a goal was sufficient to meet the stringent, compelling interest test. However, it is far from certain that section 14 serves to accomplish the desired goal. For example, the affluent could spend the maximum amount allowable under section 14 in

---

[2]RCW 42.17.140(2): "The total of such expenditures in any election campaign in connection with any other [than a state-wide] ballot proposition shall not exceed ten cents multiplied by the number of voters registered in the constituency voting on such proposition."

one concentrated campaign promotion, thereby precluding further effective political communication on the same side of the issue, affecting rich and poor alike. Conceivably, then, the power of money is increased, not diminished, by section 14.

Defendants urge us to limit our holding to subsection (2) of section 14, thereby leaving unanswered the question of the constitutionality of subsection (1) relating to limits on candidate spending. However, the trial court declared both subsections to be unconstitutional, and we agree that such action was proper as coming within the holding of *State ex rel. O'Connell v. Dubuque*, 68 Wn.2d 553, 413 P.2d 972 (1966). Facing elections in September and November of this year, candidates and the public are entitled to a holding on this point. Here, both subsections of section 14 raise the same issues of vagueness and overbreadth. Essentially the same conduct noted above which we find to be unconstitutionally affected by operation of subsection (2) is similarly restricted by subsection (1).

The judgment of the trial court declaring section 14 of Initiative 276 unconstitutional is affirmed.

HALE, C.J., and ROSELLINI, HUNTER, HAMILTON, and STAFFORD, JJ., concur.

FINLEY, J. (concurring in the result)—It is with some reluctance that I concur in the result reached by the majority.

Two centuries ago, the American people chose a representative democracy as their constitutional form of government. Our system of democracy is not a static social compact fixed in 1789, but a continuing and dynamic experiment in representative government. Democracy is a fragile thing, and its well being must be zealously guarded by the people as well as by the State as a responsive agency of the people. The State through amenable constitutional means, must take appropriate action to superintend and maintain the integrity of our electoral system.

The people of Washington in their sovereign capacity have exercised their residual legislative power through the initiative process to enact a measure designed to reduce the improper influences of money on the elective processes. This court has upheld those provisions of Initiative 276 which require extensive disclosures and reporting by public officials, lobbyists, and grass roots organizations. *Fritz v. Gorton*, 83 Wn.2d 275, 517 P.2d 911, *cert. denied*, 417 U.S. 902, 41 L. Ed. 2d 208, 94 S. Ct. 2596 (1974); *Young Americans for Freedom, Inc. v. Gorton*, 83 Wn.2d 728, 522 P.2d 189 (1974). The de minimis administrative intrusions made by the disclosure provisions of the initiative upon First Amendment rights is far outweighed by the State's compelling interest in maintaining the integrity of government.

In sharp contrast to the initiative provisions considered in our prior opinions, *supra*, unfortunately section 14, as the majority illustrates, may actually *preclude* the exercise of First Amendment rights altogether. Free speech as a vital part of open and robust political debate is the essence of our democratic system of government. It cannot be denied that in a modern idiom campaign spending is roughly the equivalent of political speech. It is true that a poor but hearty candidate may to some degree compensate for a lack of financial backing by "door belling," stumping cross-state or the like. Nonetheless, while financial expenditures may not be directly correlative with a candidate's persuasiveness, campaign spending does open avenues of communication which are foreclosed to the impecunious candidate. *Cf. Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 41 L. Ed. 2d 730, 94 S. Ct. 2831 (1974). Accordingly, it may be deemed desirable to limit the paid communications of the most affluent candidates to preclude the drowning out of less fortunate opponents. This legislative goal may well meet constitutional muster, as a reasonable limitation on spending may be justified. *Cf. Brandenburg v. Ohio*, 395 U.S. 444, 23 L. Ed. 2d 430, 89 S. Ct. 1827 (1969). However, it is in attempting this objective that section 14 fails.

The fatal flaw, in my view, is not the objective per se of section 14 in limiting the sum of campaign expenditures, but that its actual practical operations may still the voices of all citizens interested in a political issue or campaign. In conjunction with section 7, the effect of section 14 is to require the coordination of campaign expenditures with the campaign treasurer. As to a ballot proposition, the expenditures of all political committees would be required to be orchestrated into one financially unified effort to avoid overspending. *See* Attorney General Opinion, Feb. 5, 1973. In the case of individual candidates, the candidate, through his campaign treasurer, would decide which spending would yield the most favorable result. Thus, with regard to a ballot proposition, a single committee may preempt the communications of all other similarly interested groups by merely spending the maximum allowable amount under section 14. In the same vein, a candidate nearing his spending ceiling may foreclose the expression of supporters who would express their views in communications not deemed to be desirable or effective by the candidate. For example, a committee of business men which urged the election of a candidate for Seattle mayor might desire to publish an ad in the Wall Street Journal. The candidate, however, might well decide that a far more expedient forum for campaign expenditures and communication would be a Seattle daily; and therefore, reject the ad. The First Amendment problems are exacerbated if the political committee offering its assistance might be an embarrassment to the candidate. By way of possibly somewhat extreme illustration, communications bearing themes "Fascists for John Smith" or "Communists for Jim Brown" might be considered detrimental by some candidates who would prefer to avoid identification with these groups. Hence, under section 14, certain political communications could be vetoed.

The perils of section 14 are further accentuated when the subject political expressions are not directly associated with a candidate. Without straining credulity, one could hypothesize a "Committee to Defeat [Elect] Incumbents,"

"Citizens for Conservative [Liberal] Government" or "Mothers Against [for] Abortion." Arguably these latter political entities under section 14 would not be required to submit their expenditure requests to the campaign treasurer of a candidate. This is not clear, however, when the committee's political campaign is identified with one candidate alone. Thus, under the initiative if a candidate may squelch the expression of independent political communications, section 14 would be violative of the First Amendment. If section 14 does not reach the independent entity, bogus "independent" committees may be used by candidates as subterfuges to avoid the spending limitations. Moreover, if the independent committee does not secure the acquiescence required by section 7, it is presumptively subject to the sanctions of section 39. The marketplace of free political expression cannot be subjected to these vague and chilling standards.

The extensive reporting and disclosures required by the constitutionally valid provisions of sections 15, 17, 18, 20, and 24 will provide the electorate with more information about those individuals who work in the political sphere. Hopefully, the availability of added data regarding the finances of candidates and public officials, as well as the activities of lobbyists, will be carefully analyzed by the electorate. Undoubtedly, the required reporting of Initiative 276 will create a more open and socially viable marketplace of political thought and expression. More complete information concerning a candidate's finances will not, in itself, solve or alleviate the impact of unequal campaign expenditures. It is not inconceivable, however, that, armed with the knowledge of such disparities, the electorate may make appropriate evaluative compensation for the less monied candidate. It is possible that Initiative 276, by broadening the spectrum of political debate, may alleviate the perceived problem of disparate campaign spending.

In the interim, the unfettered expenditures of huge sums in political campaigns may well be an undesirable evil

which should be corrected by remedial legislation. In my opinion, the majority's decision does not preclude the enactment of more carefully drafted legislation which does not so grossly trespass upon the right to free speech. For this and other reasons stated I must concur in the result reached by the majority.

WRIGHT and UTTER, JJ., concur with FINLEY, J.