166 P.3d 1174 (2007)
VOTERS EDUCATION COMMITTEE, a Washington corporation; Bruce Boram, an individual; Valerie Huntsberry, an individual, Appellants,
v.
WASHINGTON STATE PUBLIC DISCLOSURE COMMISSION; Michael Connelly, Jeanette Wood, Francis Martin, Earl Tilly, and Jane Noland, Commissioners of the Washington State Public Disclosure Commission in their individual capacities; Vicki Rippie, Executive Director of the Washington State Public Disclosure Commission; and Christine Gregoire, Attorney General of the State of Washington in her individual capacity, Respondents, and
Deborah Senn, Respondent/Intervenor.
No. 77724-1.
Supreme Court of Washington, En Banc.
Argued May 25, 2006.
Decided September 13, 2007
*1176 John James White Jr., Kevin Blair Hansen, Livengood Fitzgerald Alskog PLLC, Kirkland, WA, David H. Thompson, Charles Cooper, Cooper & Kirk PLLC, Washington, DC, for Appellants.
Linda Anne Dalton, Carol A. Murphy, Jeffrey David Goltz, Atty General's Ofc. Govt & Enforcement, Olympia, WA, for Respondents.
Michael E Withey, Law Offices of Michael Withey, C. Steven Fury, Fury Bailey, Seattle, WA, for Respondent/Intervenor.
Harold Malkin, Yarmuth Wilsdon Calfo PLLC, Seattle, WA, Bobby R. Burchfield, Jason A. Levine, Matthew M. Leland, McDermot Will & Emery LLP, Stephen A. Bokat, Judith K. Richmond, National Chamber Litigation Center, Inc., Washington, DC, for Amicus Curiae on behalf of United States Chamber of Commerce.
Hugh Davidson Spitzer, Foster Pepper PLLC, Seattle, WA, J. Gerald Hebert, Paul S. Ryan, Eva Howe, Campaign Legal Center, *1177 Washington, DC, for Amicus Curiae on behalf of Campaign Legal Center.
FAIRHURST, J.
ś 1 During the 2004 campaign for Washington State Attorney General, the Voters Education Committee (VEC)[1] sponsored television advertisements without registering as a "political committee" or disclosing information about its contributions and expenditures. The Washington State Public Disclosure Commission (PDC)[2] brought an enforcement action against VEC for failure to register and disclose. In response, VEC brought this constitutional claim against the PDC, alleging that the PDC was unconstitutionally regulating VEC's political speech. The trial court granted summary judgment to the PDC, holding that VEC's advertisement "Better" constituted "express advocacy" rather than "issue advocacy" and that, as a result, VEC was a political committee subject to regulation. On direct appeal, VEC argues that the definition of "political committee" is vague and that the trial court erred in applying the distinction between express advocacy and issue advocacy.
ś 2 We hold that the definition of "`[p]olitical committee'" in former RCW 42.17.020(33) (2002) is not vague. We further hold that VEC met the definition of a political committee. As a result, we hold that the PDC did not unconstitutionally infringe on VEC's free speech rights by seeking to compel VEC to register as a political committee and to disclose its contributions and expenditures. Because the regulation at issue is not vague, we need not reach the issue of whether the trial court correctly applied the distinction between express advocacy and issue advocacy. We also hold that article I, section 5 of the Washington Constitution does not provide greater protection against disclosure requirements than does the first amendment to the United States Constitution. We affirm the trial court's dismissal of VEC's constitutional claims.

I. FACTUAL AND PROCEDURAL HISTORY
ś 3 Beginning on September 1, 2004, VEC sponsored two television advertisements criticizing Deborah Senn, Washington's former insurance commissioner. At the time, Senn was a candidate for attorney general of Washington. The advertisements aired on television stations throughout the state until approximately September 8, 2004. The primary election occurred on September 14, 2004.
ś 4 The television advertisement at issue in this case was entitled "Better" and included a voice-over narration in combination with on-screen text and images. The script of the voice-over narration read:
Who is Deborah Senn looking out for?
As Insurance Commissioner, Senn suspended most of a $700,000 fine against an insurance company . . . in exchange for the company's agreement to pay for four new staff members in Senn's own office.
Senn even tried to cover up the deal from State Legislators.
The Seattle Post-Intelligencer said Senn's actions "easily could lead to conflict-of-interest abuses."
Deborah Senn let us down . . . log on to learn more.
Clerk's Papers (CP) at 51 (ellipsis in original).[3]
ś 5 During the voice-over narration, the following combinations of text and images appeared on the screen:
Text on black background: "Who is Deborah Senn looking out for?"

*1178 Text with image of money: "Suspended Most of $700,000 Fine Source: Seattle Times 2/20/97"

Text with image of Insurance Commissioner's office: "In Exchange for New Staff in Her Office Source: Seattle Times 2/20/97"

Text with image of Washington State Capital: "Tried to Cover Up Deal from State Legislators Source: Seattle Times 2/20/97"

Text with image of newspaper, Seattle Post-Intelligencer banner head: "`. . . easily could lead to conflict-of-interest abuses.' 2/27/97"

Text on black background:
"Deborah Senn Let Us Down Learn More About the Insurance Crisis www.senninsurancecrisis.com
Paid for by Voters Education Committee."
Dec. of Vicki Rippie (Sept. 10, 2004), Attach. E (videotape of KIRO TV Sept. 3, 2004 advertisement) (Rippie Dec.).
ś 6 On September 7, 2004, the PDC sent a letter to VEC stating its opinion that VEC's advertisements constituted express advocacy and directing VEC to register as a political committee and to "file all reports of contributions received and expenditures made by the committee to date."[4] CP at 611. On September 9, 2004, VEC responded through its counsel that it did not believe that it was "subject to registration or reporting under Washington law." CP at 447. That same day, the PDC held a special commission meeting and "found apparent multiple violations" of Washington campaign financing laws by VEC. CP at 450. The PDC referred the matter to the Washington State Attorney General's office "for appropriate action . . . including seeking a court order compelling [VEC] . . . to file the disclosure reports required." Id.
ś 7 On September 10, 2004, the PDC initiated an enforcement action in Thurston County Superior Court to compel VEC to comply with the registration and reporting requirements and seeking penalties for noncompliance. State ex rel. Wash. State Pub. Disclosure Comm'n v. Voters Educ. Comm., No. 04-2-01845-2, Thurston County Superior Court (PDC v. VEC). At the same time, VEC initiated this action in King County Superior Court against the PDC under 42 U.S.C. § 1983 seeking a declaratory judgment that VEC's advertisements were protected speech under the first amendment to the United States Constitution and under article I, section 5 of the Washington Constitution. VEC also sought attorney fees under 42 U.S.C. § 1988 and other statutes. The PDC's enforcement proceeding was later transferred to King County Superior Court and assigned to the same judge as VEC's case. PDC v. VEC, No. 04-2-33247-8-SEA, King County Superior Court.
ś 8 After these cases were filed, VEC agreed to register with the PDC and filed reports documenting contributions to VEC and VEC's expenditures. VEC's disclosures indicated that the committee had received a single contribution from the United States Chamber of Commerce in the amount of $1.5 million and that VEC had spent more than $1.4 million of that amount. On September 21, 2004, Deborah Senn moved to intervene in the case, and the trial court subsequently granted her motion.
ś 9 Prior to trial, VEC moved for summary judgment. On August 12, 2005, following *1179 oral argument on the summary judgment motion, the trial court issued an oral ruling that VEC's advertisement was not protected speech that was beyond the reach of regulation by the PDC and that VEC had failed to prove its constitutional claims. The court denied VEC's summary judgment motion and dismissed the case. VEC sought direct review by this court, and we agreed to retain the case.[5]

II. ISSUES
A. Whether the PDC unconstitutionally infringed on VEC's First Amendment rights by enforcing disclosure requirements.
1. Whether the definition of "`[p]olitical committee'" in former RCW 42.17.020(33) is unconstitutionally vague.
2. Whether the trial court properly applied the distinction between express advocacy and issue advocacy.
B. Whether article I, section 5 of the Washington Constitution provides greater protection against disclosure requirements than the First Amendment.
C. Whether VEC is entitled to attorney fees and expenses.

III. ANALYSIS
A. The PDC did not unconstitutionally infringe on VEC's First Amendment rights by enforcing disclosure requirements
ś 10 The first amendment to the United States Constitution provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances." This court has recognized time and again the particular importance of protecting political speech. "[T]he United States Supreme Court and this court have remained steadfast in protecting the right to full and vigorous discussion of political issues, free from government regulations." Wash. State Republican Party v. Pub. Disclosure Comm'n, 141 Wash.2d 245, 250, 4 P.3d 808 (2000) (WSRP).
ś 11 At the same time, the citizens of Washington have repeatedly declared their strong commitment to disclosing the identity of and financing behind political speakers. In 1972, the citizens of Washington passed Initiative Measure No. 276, which formed the basis of Washington's campaign finance laws and established the PDC. See RCW 42.17.350. Part of Initiative 276 provides:
It is hereby declared by the sovereign people to be the public policy of the state of Washington:
(1) That political campaign and lobbying contributions and expenditures be fully disclosed to the public and that secrecy is to be avoided.
. . . .
(10) That the public's right to know of the financing of political campaigns and lobbying and the financial affairs of elected officials and candidates far outweighs any right that these matters remain secret and private.
. . . .
The provisions of this chapter shall be liberally construed to promote complete disclosure of all information respecting the financing of political campaigns and lobbying . . . so as to assure continuing public confidence of fairness of elections and governmental processes, and so as to assure that the public interest will be fully protected.
RCW 42.17.010. As this court has recognized, the purpose of Initiative 276 is "to ferret out . . . those whose purpose is to influence the political process and subject them to the reporting and disclosure requirements of the act in the interest of public information." State v. (1972) Dan J. Evans Campaign Comm., 86 Wash.2d 503, 508, 546 P.2d 75 (1976).
*1180 ś 12 In 1992, the citizens of Washington also passed Initiative Measure No. 134, which, together with Initiative 276, is generally referred to as the Fair Campaign Practices Act (FCPA), chapter 42.17 RCW. The FCPA requires political committees to register with the PDC and provide information about the committee, contributions to the committee, and the committee's expenditures. See RCW 42.17.040-.090. The FCPA defines "`[p]olitical committee'" as "any person (except a candidate or an individual dealing with his or her own funds or property) having the expectation of receiving contributions or making expenditures in support of, or opposition to, any candidate or any ballot proposition." Former RCW 42.17.020(33). As a result, at the time of VEC's advertisements, if VEC met the definition of a "political committee," the FCPA required that VEC register with and disclose its contributions and expenditures to the PDC.[6]

Standard of Review
ś 13 VEC appeals the trial court's grant of summary judgment to the PDC, arguing that the definition of "political committee" is unconstitutionally vague and that, as a result, the PDC violated VEC's First Amendment rights by compelling VEC's disclosures. This court reviews motions for summary judgment de novo. Berrocal v. Fernandez, 155 Wash.2d 585, 590, 121 P.3d 82 (2005). Summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Id.; CR 56(c). Here, there is no genuine issue of material fact. Therefore, we need only decide whether the PDC's regulation of VEC's political speech was unconstitutional as a matter of law. This court also reviews interpretations of statutes and determinations of the constitutionality of statutes de novo. In re Parentage of C.A.M.A., 154 Wash.2d 52, 57, 109 P.3d 405 (2005).
ś 14 In general, "`[a] statute is presumed to be constitutional, and the party challenging its constitutionality bears the burden of proving its unconstitutionality beyond a reasonable doubt.'" State v. Hughes, 154 Wash.2d 118, 132, ś 25, 110 P.3d 192 (2005) (quoting State v. Thorne, 129 Wash.2d 736, 769-70, 921 P.2d 514 (1996)), overruled in part on other grounds by Washington v. Recuenco, ___ U.S. ___, 126 S.Ct. 2546, 165 L.Ed.2d 466 (2006). However, as VEC notes, in the First Amendment context the burden shifts and the State usually "bears the burden of justifying a restriction on speech." Ino Ino, Inc. v. City of Bellevue, 132 Wash.2d 103, 114, 937 P.2d 154, 943 P.2d 1358 (1997).
ś 15 While we must scrutinize any regulation of speech, the particular type of regulation the PDC seeks to enforce in this case also impacts our consideration of the constitutionality of that regulation. Much of VEC's discussion of the regulation of its political speech presumes a limitation of that speech, as occurs with limits on political contributions or expenditures. The regulations at issue in this case, however, are disclosure requirements. The United States Supreme *1181 Court has recognized that compelled disclosure may encroach on First Amendment rights by infringing on the privacy of association and belief. Buckley v. Valeo, 424 U.S. 1, 64, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). As a result, the Court has held that disclosure regulations must survive "exacting scrutiny" and that there must be a "relevant correlation" or "substantial relation" between the governmental interest and the information required to be disclosed. Id. (internal quotation marks omitted).
ś 16 However, the Court has also recognized that unlike "overall limitations on contributions and expenditures, . . . disclosure requirements impose no ceiling on campaign-related activities." Id. The Court has also observed that "[t]he governmental interests sought to be vindicated by . . . disclosure requirements," such as providing the electorate with information and deterring corruption and the appearance of corruption, are "sufficiently important to outweigh the possibility of infringement."[7]Id. at 66, 96 S.Ct. 612. Therefore, the Court concluded that "disclosure requirements â certainly in most applications â appear to be the least restrictive means of curbing the evils of campaign ignorance and corruption." Id. at 68, 96 S.Ct. 612.
ś 17 As the PDC notes, the right to free speech "includes the `fundamental counterpart' of the right to receive information." Am. Br. of Resp'ts at 12 (quoting Fritz v. Gorton, 83 Wash.2d 275, 296-97, 517 P.2d 911 (1974)). "The constitutional safeguards which shield and protect the communicator, perhaps more importantly also assure the public the right to receive information in an open society." Fritz, 83 Wash.2d at 297, 517 P.2d 911. In McConnell v. Federal Election Commission, 540 U.S. 93, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003), the United States Supreme Court considered the relationship between the disclosure requirements in the Bipartisan Campaign Reform Act of 2002 (BCRA) and the First Amendment values of "uninhibited, robust, and wide-open" political speech.
"BCRA's disclosure provisions require . . . organizations to reveal their identities so that the public is able to identify the source of the funding behind broadcast advertisements influencing certain elections. Plaintiffs' disdain for BCRA's disclosure provisions is nothing short of surprising. Plaintiffs challenge BCRA's restrictions on electioneering communications on the premise that they should be permitted to spend . . . funds . . . on broadcast advertisements, which refer to federal candidates, because speech needs to be uninhibited, robust, and wide-open. Curiously, Plaintiffs want to preserve the ability to run these advertisements while hiding behind dubious and misleading names like: The Coalition-Americans Working for Real Change (funded by business organizations opposed to organized labor), Citizens for Better Medicare (funded by the pharmaceutical industry), Republicans for Clean Air (funded by brothers Charles and Sam Wyly). Given these tactics, Plaintiffs never satisfactorily answer the question of how uninhibited, robust, and wide-open speech can occur when organizations hide themselves from the scrutiny of the voting public. Plaintiffs' argument for striking down BCRA's disclosure provisions does not reinforce the precious First Amendment values that Plaintiffs argue are trampled by BCRA, but ignores the competing First Amendment interests of individual citizens seeking to make informed choices in the political marketplace."
Id. at 196-97, 124 S.Ct. 619 (emphasis added) (citations omitted) (internal quotation marks omitted) (quoting McConnell v. Fed. Election Comm'n, 251 F.Supp.2d 176, 237 (D.D.C. 2003)). As the McConnell Court observed, disclosure requirements "`d[o] not prevent anyone from speaking.'" 540 U.S. at 201, 124 S.Ct. 619 (alteration in original) (quoting *1182 McConnell, 251 F.Supp.2d at 241). With this context in mind, we consider whether the FCPA's disclosure regulations unconstitutionally burdened VEC's speech.
1. The definition of "`[p]olitical committee'" in former RCW 42.17.020(33) is not unconstitutionally vague
ś 18 The United States Supreme Court has repeatedly recognized that a vague regulation of speech infringes on First Amendment rights. See, e.g., Reno v. Am. Civil Liberties Union, 521 U.S. 844, 871-72, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997) ("The vagueness of such a regulation raises special First Amendment concerns because of its obvious chilling effect on free speech."). This court has also recognized that "`[i]f speakers are not granted wide latitude to disseminate information without government interference, they will steer far wider of the unlawful zone.'" WSRP, 141 Wash.2d at 265, 4 P.3d 808 (internal quotation marks omitted) (quoting Fed. Election Comm'n v. Cent. Long Island Tax Reform Immediately Comm., 616 F.2d 45, 54-55 (2d Cir.1980)). "`This danger is especially acute when an official agency of government has been created to scrutinize the content of political expression, for such bureaucracies feed upon speech and almost ineluctably come to view unrestrained expression as a potential "evil" to be tamed, muzzled or sterilized.'" Id.
ś 19 Under the Fourteenth Amendment, a statute may be void for vagueness "if it is framed in terms so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its application." O'Day v. King County, 109 Wash.2d 796, 810, 749 P.2d 142 (1988) (citing Connally v. Gen. Constr. Co., 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926); Papachristou v. City of Jacksonville, 405 U.S. 156, 162, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972)). Moreover, the Supreme Court has "repeatedly emphasized that where First Amendment freedoms are at stake a greater degree of specificity and clarity of purpose is essential." Id. (citing, e.g., Erznoznik v. City of Jacksonville, 422 U.S. 205, 217-18, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975)).
ś 20 VEC argues that the definition of "political committee" is unconstitutionally vague. The PDC argues that the definition of "political committee" is not vague or that, in the alternative, if this court finds that the definition is vague, this court should construe the definition in a limiting way so as to preserve the constitutionality of the statute. In analyzing this issue, we first turn to the United States Supreme Court's seminal decision in Buckley.
ś 21 In Buckley, the United States Supreme Court considered the constitutionality of a provision of the Federal Election Campaign Act of 1971 (FECA) that limited campaign expenditures "`relative to a clearly identified candidate.'" 424 U.S. at 13, 96 S.Ct. 612 (quoting former 18 U.S.C. § 608(e)(1) (1974)). The Court concluded that the phrase "relative to" was vague in that it "fail[ed] to clearly mark the boundary between permissible and impermissible speech." Id. at 41, 96 S.Ct. 612. However, in order to avoid rendering the statute unconstitutional, the Court adopted a saving construction of the statute. The Court construed the statute to apply only to expenditures for communications that expressly advocated the election or defeat of a clearly identified candidate. Id. at 42-44, 80, 96 S.Ct. 612. The Court supplied examples of words that would constitute express advocacy, "such as `vote for,' `elect,' `support,' `cast your ballot for,' `Smith for Congress,' `vote against,' `defeat,' `reject.'" Id. at 44 n. 52, 96 S.Ct. 612. However, the Court also recognized that "the distinction between discussion of issues and candidates and advocacy of election or defeat of candidates may often dissolve in practical application." Id. at 42, 96 S.Ct. 612.
ś 22 Following Buckley, this court considered the constitutionality of FCPA provisions limiting campaign expenditures in the context of an advertisement that criticized Gary Locke, then a candidate for governor. WSRP, 141 Wash.2d at 250-51, 4 P.3d 808. The advertisement listed facts that indicated Locke's position on fighting crime, such as voting "no" on the "Three Strikes, You're Out" law. Id. at 251, 4 P.3d 808 (internal quotation marks omitted). The advertisement *1183 ended by directing viewers to "Tell Gary Locke that's not what we call getting tough on crime. Tell Gary Locke that we deserve better." Id. at 252, 4 P.3d 808 (internal quotation marks omitted). We determined that the Locke advertisement was issue advocacy because it attacked his stance on an issue rather than his character. Id. at 270, 4 P.3d 808. Relying on Buckley, we stated that "in order to avoid vagueness and a chilling effect on political speech, Buckley requires the definition of election-related speech to be sharply drawn." Id. at 266, 4 P.3d 808. We observed that the statute at issue included multiple definitions of the word "expenditure," including defining expenditure as "a payment or contribution, with no reference to a candidate." Id. at 282, 4 P.3d 808. As a result, we concluded that the challenged statutory provisions were unconstitutional limits on issue advocacy. Id.
ś 23 Finally, in McConnell, the United States Supreme Court considered the constitutionality of the BCRA. 540 U.S. at 114, 124 S.Ct. 619. In addressing the distinction between express advocacy and issue advocacy, the Court observed that although it "seemed neat in theory, the two categories of advertisements proved functionally identical in important respects." Id. at 126, 124 S.Ct. 619. The Court rejected the argument that Buckley "drew a constitutionally mandated line between express advocacy and so-called issue advocacy, and that speakers possess an inviolable First Amendment right to engage in the latter category of speech." Id. at 190, 124 S.Ct. 619 (emphasis added). "That position misapprehends our prior decisions, for the express advocacy restriction was an endpoint of statutory interpretation, not a first principle of constitutional law." Id. (emphasis added). The Court further clarified that when interpreting FECA's disclosure provision in Buckley, the Court determined that the phrase "`for the purpose of . . . influencing'" a federal election was impermissibly vague. Id. at 191, 124 S.Ct. 619 (quoting Buckley, 424 U.S. at 77, 96 S.Ct. 612). As a result, the Court construed that section as reaching "`only funds used for communications that expressly advocate the election or defeat of a clearly identified candidate.'" Id. (quoting Buckley, 424 U.S. at 80, 96 S.Ct. 612). The Court emphasized that "[i]n narrowly reading the FECA provisions in Buckley to avoid problems of vagueness and overbreadth, [it] nowhere suggested that a statute that was neither vague nor overbroad would be required to toe the same express advocacy line." Id. at 192, 124 S.Ct. 619.
ś 24 Independent of Buckley, the Court in McConnell also acknowledged that the First Amendment does not require a strict distinction between express advocacy and issue advocacy.
Nor are we persuaded, independent of our precedents, that the First Amendment erects a rigid barrier between express advocacy and so-called issue advocacy. That notion cannot be squared with our long-standing recognition that the presence or absence of magic words cannot meaningfully distinguish electioneering speech from a true issue ad.
Id. at 193, 124 S.Ct. 619 (emphasis added). Instead, the Court described the distinction as "functionally meaningless." Id. The Court recognized that even though certain "advertisements do not urge the viewer to vote for or against a candidate in so many words, they are no less clearly intended to influence the election."[8]Id.
*1184 ś 25 In light of Buckley, VEC asserts that the phrase "`in support of, or opposition to, any candidate'" in the definition of "`[p]olitical committee'" is unconstitutionally vague. Am. Br. of Appellants at 19 (quoting RCW 42.17.020(38)). However, the phrase "in support of, or opposition to, any candidate" is significantly more precise than the phrase "relative to a clearly identified candidate," which the Court determined was vague in Buckley. As the PDC notes, the United States Supreme Court has upheld the words "support" and "oppose" as sufficiently precise to withstand a vagueness challenge in McConnell.
The words "promote," "oppose," "attack," and "support" clearly set forth the confines within which potential party speakers must act in order to avoid triggering the provision. These words "provide explicit standards for those who apply them" and "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited."[9]
McConnell, 540 U.S. at 170 n. 64, 124 S.Ct. 619 (quoting Grayned v. City of Rockford, 408 U.S. 104, 108-09, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972)). Thus, we conclude that a person of ordinary intelligence would have a reasonable opportunity to understand the meaning of "in support of, or opposition to, any candidate" in the definition of "`[p]olitical committee'" in former RCW 42.17.020(33).
ś 26 VEC also argues that this court previously determined that the phrase "in support of, or in opposition to, a candidate" was unconstitutionally vague in Bare v. Gorton, 84 Wash.2d 380, 526 P.2d 379 (1974). However, Bare does not establish binding precedent here. First, we did not consider the definition of "political committee" in Bare.[10] In fact, we specifically noted that there was "no doubt" that the school district committee involved in that case was a "political committee." Id. at 382, 526 P.2d 379.
ś 27 Second, the phrase "in support of, or in opposition to, a candidate," did not appear anywhere in former RCW 42.17.140 (1973), the challenged statute that we did invalidate in Bare. Former RCW 42.17.140 placed limitations on "expenditures made in any election *1185 campaign in connection with any public office." (Emphasis added.) We did observe that former RCW 42.17.140 established "limits for every election campaign for and against any ballot proposition" and wondered "what standards are to be used in determining whether a particular communication is for or against a proposition."[11]Bare, 84 Wash.2d at 383, 526 P.2d 379. However, this was only one of more than six factors that we considered in determining that former RCW 42.17.140 was vague. Id. at 383-84, 526 P.2d 379.
ś 28 Third, Bare concerned expenditure limits rather than disclosure requirements. As we observed, former RCW 42.17.140 was "fatally defective because it . . . operate[d] to prohibit absolutely plaintiff and others from exercising their constitutionally guarantied freedom of speech." Id. at 385, 526 P.2d 379. The above discussion demonstrates that Bare is entirely distinguishable from this case.
ś 29 VEC's argument that it relied on Bare to determine whether the committee needed to comply with the FCPA's disclosure requirements is unpersuasive, as Bare did not consider the definition of "political committee" or the words "in support of, or opposition to, any candidate" and did not even concern disclosure requirements. The definition of "political committee" upon which VEC could have reasonably relied is the definition that is clear from the statutory language of former RCW 42.17.020(33). Thus, we reject VEC's argument that the PDC or this court is somehow altering the definition of "political committee" and that, if we do so, we "should do so on a purely prospective basis that would not permit the PDC to impose a fine upon the VEC." Br. in Resp. to Br. of Amicus Curiae Campaign Legal Center (CLC) at 13.
ś 30 We conclude that the words "in support of, or opposition to, any candidate" are not vague and that the definition of "`[p]olitical committee'" in former RCW 42.17.020(33) is not unconstitutionally vague. We further conclude that VEC met this definition of "political committee" when it ran the television advertisement "Better" in September 2004.[12]
ś 31 "Better" began by asking "[w]ho is Deborah Senn looking out for?", establishing a contemporary focus for the advertisement. CP at 51; Rippie Dec. (emphasis added). "Better" then presented select quotations from 1997 newspaper articles about Senn's performance as the then-incumbent Washington State insurance commissioner.[13]Id. "Better" concluded "Deborah Senn Let Us Down." Id. When VEC ran "Better" in September 2004, Senn was no longer insurance commissioner â she was a private citizen running for the office of attorney general. VEC's review of Senn's insurance commissioner record in "Better" had contemporary significance only with respect to Senn's candidacy for attorney general.
ś 32 Nor can "Better" accurately be described as the type of advertisement that simply makes a neutral, factual assertion which could be "viewed as `supporting'" by some, "but viewed as `opposing'" by others, depending on the viewer's opinion of the neutral assertion. Dissent at 1191. Unlike the dissent's example of such an advertisement, one stating no more than "`Jones will cut hospital funding,'" id., "Better" expressly supplied viewers with a conclusion to be *1186 drawn from the advertisement â "Deborah Senn Let Us Down." Rippie Dec. Given Senn's status â no longer incumbent insurance commissioner and currently a candidate for attorney general â the "Better" advertisement was clearly in opposition to Senn's candidacy.[14]
ś 33 We hold that the PDC did not infringe on VEC's First Amendment rights by compelling VEC to register with the PDC as a political committee and to disclose information about the committee's contributions and expenditures.
2. Because former RCW 42.17.020(33) is not vague, a determination of whether VEC's advertisement constituted express advocacy or issue advocacy is unnecessary
ś 34 In McConnell, the United States Supreme Court clarified that a determination of whether an advertisement constitutes express advocacy or issue advocacy is unnecessary if the regulation at issue is not vague. 540 U.S. at 193-94, 124 S.Ct. 619. In its oral decision denying summary judgment to VEC, the trial court observed that the United States Supreme Court's decision in McConnell "changed the rules of engagement on the distinction between express and issue advocacy," "overturned a significant portion of Buckley as relied upon by our state supreme court in WSRP," and "rendered a distinction between express and issue advocacy . . . `functionally meaningless.'" CP at 425. Despite this conclusion, the trial court proceeded to hold that VEC's advertisement was a character attack on Ms. Senn that constituted express advocacy because it "was an exhortation to vote against Senn." CP at 427.
ś 35 The trial court's implication that McConnell overturned Buckley and erased the distinction between express advocacy and issue advocacy does not accurately reflect the holding of McConnell. However, McConnell did clarify that the distinction between express advocacy and issue advocacy articulated in Buckley was not constitutionally mandated but was instead a tool of statutory construction. 540 U.S. at 191-92, 124 S.Ct. 619. We conclude that the trial court's determination that VEC's advertisement constituted express advocacy was unnecessary because former RCW 42.17.020(33) was not unconstitutionally vague. As a result, we decline to reach the issue of whether VEC's advertisement constituted express advocacy or issue advocacy.
B. Article I, section 5 of the Washington Constitution does not provide greater protection against disclosure requirements than the First Amendment
ś 36 VEC also contends that the PDC violated VEC's free speech rights under article I, section 5 of the Washington Constitution.[15] VEC argues that "article I, section 5, is more protective of election-related speech than the First Amendment, and in particular that article I, section 5, demands special scrutiny to ensure that vague regulations do not operate as prior restraints." Am. Br. of Appellants at 47. VEC also asserts that the trial court erred when it concluded that "any additional *1187 protections" provided by article I, section 5 "should be extended to the voters' right to information regarding political activity, not the right of VEC to restrict disclosure of the information." CP at 427-28.
ś 37 Article I, section 5 of the Washington Constitution provides that "[e]very person may freely speak, write and publish on all subjects, being responsible for the abuse of that right." "Unlike the First Amendment, article 1, section 5 categorically rules out prior restraints on constitutionally protected speech under any circumstances."[16]O'Day, 109 Wash.2d at 804, 749 P.2d 142; see also Ino Ino, 132 Wash.2d at 117, 937 P.2d 154. As the PDC notes, "`a prior restraint is an administrative or judicial order forbidding communications prior to their occurrence. Simply stated, a prior restraint prohibits future speech, as opposed to punishing past speech.'" Am. Br. of Resp'ts at 26 n. 21 (emphasis added) (quoting Soundgarden v. Eikenberry, 123 Wash.2d 750, 764, 871 P.2d 1050 (1994)); see also Ino Ino, 132 Wash.2d at 117, 937 P.2d 154.
ś 38 VEC argues that article I, section 5 is violated in this case because the disclosure requirements at issue are overly vague and thereby constitute prior restraints on speech. But other than the definition of "`[p]olitical committee'" in former RCW 42.17.020(33), VEC does not challenge any provisions of the FCPA on vagueness grounds. Because we hold that former RCW 42.17.020(33) is not vague, we also necessarily conclude that the statute does not rise to the level of a prior restraint as a result of vagueness. Thus, we need only determine whether the disclosure requirements at issue in this case prohibit future speech and, thereby, rise to the level of an unconstitutional prior restraint.
ś 39 VEC fails to articulate how the FCPA's disclosure requirements prohibited its speech. This court has never specifically stated that compelled disclosure constitutes a prior restraint on political speech, nor have we held that article I, section 5 of the Washington Constitution provides greater protection against disclosure requirements. As noted earlier, the United States Supreme Court has recognized that compelled disclosure "can seriously infringe on privacy of association and belief guaranteed by the First Amendment." Buckley, 424 U.S. at 64, 96 S.Ct. 612. However, in Buckley, the Court determined that the disclosure requirements at issue were not a "prior restraint, but a reasonable and minimally restrictive method of furthering First Amendment values by opening the basic processes of our federal election system to public view." Id. at 82, 96 S.Ct. 612. More recently the United States Supreme Court has stated that disclosure requirements "`d[o] not prevent anyone from speaking.'" McConnell, 540 U.S. at 201, 124 S.Ct. 619 (alteration in original) (quoting McConnell, 251 F.Supp.2d at 241).
ś 40 Nor has VEC established that the disclosure requirements restricted VEC's speech before it engaged in protected speech. RCW 42.17.040 states that a political committee must file a statement of organization with the PDC "within two weeks after its organization or, within two weeks after the date when it first has the expectation of receiving contributions or making expenditures in any election campaign, whichever is earlier." Thus, it was possible for VEC to have received contributions and made expenditures prior to registering with the PDC without violating the terms of RCW 42.17.040. Additionally, RCW 42.17.080, which governs the reporting of contributions to and expenditures from political committees, requires that *1188 the political committee disclose contributions only after receiving them and expenditures only after making them. Thus, the disclosure requirements did not in any way prohibit VEC's future speech.[17] VEC has failed to prove that the disclosure requirements in this case constitute an unconstitutional prior restraint on protected speech.
ś 41 VEC also challenges the trial court's conclusion that "any additional protections" provided by article I, section 5 "should be extended to the voters' right to information regarding political activity, not the right of VEC to restrict disclosure of the information." CP at 427-28. VEC argues that article I, section 5 is "less tolerant of vagueness in regulations of election-related speech than is the First Amendment." Am. Br. of Appellants at 39. However, as noted above, this court has previously held that article I, section 5 is only more protective if the vague regulation amounts to a prior restraint. Because VEC has not proven that the regulation amounts to a prior restraint and because we conclude that the regulation is not vague, VEC can establish no greater protection purely on vagueness grounds.
ś 42 VEC also argues that "[t]here is no evidence from the State Constitutional Convention that suggests that the framers . . . contemplated regulating election-related speech" and that "at the time article I, section 5, was adopted, election-related speech was entirely unregulated in the State." Am. Br. of Appellants at 41. However, this argument does not prove that the framers or the legislature intended to protect against disclosure requirements â it proves only that history is silent on the issue.
ś 43 On the other hand, the PDC argues that constitutional history and preexisting state law indicate that any additional protections found in article I, section 5 should be construed to protect the public's right to obtain information about political campaigns. The PDC identifies "at least two themes running through the history of the convention that indicate that this Court should rule on the side of the public's right to know." Am. Br. of Resp'ts at 30. The PDC identifies these two themes as (1) the framers' concern about the power of corporations and (2) the related distrust of government and corporate influence on government. Id. at 30-31. As a result, the PDC states that the framers "included several provisions designed to limit the power of corporations" (see, e.g., WASH. CONST., art. XII) and to keep the public informed about legislative activities (see, e.g., WASH. CONST., art. II, §§ 19, 37). Id. at 31.
ś 44 The PDC also asserts that preexisting law reinforces that "[t]he people of the state of Washington have a long history of protecting themselves from the exact type of secrecy VEC tried to engage in prior to the commencement of this case." Am. Br. of Resp'ts at 33. The PDC cites Initiative 276 and Initiative 134, as well as this court's decisions in Fritz (upholding the constitutionality of disclosure requirements of elected officials financial affairs in section 24 of Initiative 276) and Bare (upholding the constitutionality of campaign expenditure limits in section 14 of Initiative 276), as evidence of this commitment. Am Br. of Resp'ts at 33-34. On balance, neither constitutional history nor preexisting state law prove an intention to protect against disclosure requirements, and both prove an intention to protect *1189 citizens against powerful corporate interests. Considering all of the above, we hold that article I, section 5 of the Washington Constitution does not provide greater protection against disclosure requirements than the First Amendment.
C. Whether VEC is entitled to attorney fees and expenses
ś 45 Pursuant to RAP 18.1, VEC also requests that this court award it reasonable attorney fees and expenses under 42 U.S.C. § 1988. Because we affirm the trial court, VEC is not the prevailing party and is not entitled to attorney fees and expenses under 42 U.S.C. § 1988.

IV. CONCLUSION
ś 46 We hold that the definition of "political committee" is not vague and that the FCPA's disclosure requirements did not unconstitutionally burden VEC's speech. Because we hold that former RCW 42.17.020(33) is not vague, we need not reach the issue of whether VEC's advertisement constituted express advocacy or issue advocacy. We also hold that article I, section 5 of the Washington Constitution does not provide greater protection against disclosure requirements.
ś 47 The people have declared that it is the policy of the state of Washington that groups who sponsor political advertising must disclose their identities, contributions, and expenditures. Contrary to VEC's assertions, these disclosure requirements do not restrict political speech â they merely ensure that the public receives accurate information about who is doing the speaking. As Justice Brandeis famously observed, "`[p]ublicity is justly commended as a remedy for social and industrial diseases. Sunlight is said to be the best of disinfectants; electric light the most efficient policeman.'" Buckley, 424 U.S. at 67, 96 S.Ct. 612 (quoting Louis D. BRANDEIS, OTHER PEOPLE'S MONEY 62 (Nat'l Home Library Found. ed.1933)). We affirm the trial court's dismissal of VEC's constitutional claims.
WE CONCUR: GERRY L. ALEXANDER, Chief Justice, CHARLES W. JOHNSON, BARBARA A. MADSEN, BOBBE J. BRIDGE, TOM CHAMBERS, SUSAN OWENS, Justices.
J.M. JOHNSON, J. (dissenting).
ś 48 Any government regulation of political speech too readily becomes censorship, which violates constitutional rights. Even disclosure requirements, if applied to political speech, must utilize a bright line test that can be clearly understood and may not be subjectively interpreted by state enforcers.[1] This constitutional requirement, critical when regulating political speech, was famously articulated in the Supreme Court's ruling that only a bright line test "`offers . . . security for free discussion.'" Buckley v. Valeo, 424 U.S. 1, 43, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (quoting Thomas v. Collins, 323 U.S. 516, 535, 65 S.Ct. 315, 89 L.Ed. 430 (1945)). The Court went on to say that any other approach "`puts the speaker . . . wholly at the mercy of the varied understanding of his hearers and consequently of whatever inference may be drawn as to his intent and meaning.'" Id.
ś 49 If a government entity like the Public Disclosure Commission (PDC) has the power to regulate political speech through context analysis, the State can stifle attempts to speak truth to power. I cannot endorse government speech sentinels claiming power to divine a speaker's intent. Such regulation vitiates core protections of political speech under the United States and Washington Constitutions. I respectfully dissent.

NATURE OF THE CASE
ś 50 The issue presented is whether the "political committee" definition in former *1190 RCW 42.17.020(33) (2002) is vague. If vague, this court has previously ruled we must apply the United States Supreme Court's Buckley saving construction. If the language is not vague, as the majority argues, then the analysis must explain how an advertisement reprinting newspaper stories about performance in a different public office clearly "opposes" Ms. Deborah Senn's candidacy. Finally, any requirement that a political speaker first disclose all donors must be narrowly tailored and cannot be a prior restraint on speech.

FACTS
ś 51 In August and early September 2004, the Voters Education Committee (VEC) ran a series of television advertisements consisting of newspaper headlines about Ms. Senn's actions as insurance commissioner, the position she held years before she ran for attorney general. The PDC on September 7, 2004, advised the VEC that one of these advertisements[2] was "malign[ing]" Ms. Senn's character. Clerk's Papers (CP) at 611. Due to this subjective designation by the PDC, actually done by staff, the VEC was labeled a "political committee" and therefore subject to the prior registration and disclosure requirements. Former RCW 42.17.020(33); see also CP at 611.
ś 52 Former RCW 42.17.020(33) defines a "political committee" in relevant part "as any person (except a candidate or an individual dealing with his or her own funds or property) having the expectation of receiving contributions or making expenditures in support of, or in opposition to, any candidate or any ballot proposition" (hereafter the last phrase is referred to as the "support or oppose" test). In order to comply with this new designation by the PDC, the VEC ultimately filed a disclosure form. The form indicated a single contribution from the national office of the United States Chamber of Commerce.
ś 53 The VEC brought the instant action against the PDC, arguing that this regulation of its Senn advertisements and possible imposition of financial penalties are impermissible under article I, section 5 of the Washington Constitution and the First Amendment to the United States Constitution. Specifically, the VEC correctly asserts (1) that the statute which defines "political committee" for PDC registration and disclosure purposes is vague if applied without a saving construction; (2) that the superior court did not apply the express candidate advocacy/issue advocacy saving construction found in prior decisions of this court and the United States Supreme Court in Buckley; (3) that the PDC requirement of registration and disclosure before publication of ads, recounting newspaper stories of Ms. Senn's performance in a prior office, amount to a prior restraint of their speech; and (4) that they are entitled to attorney fees.

STANDARD OF REVIEW
ś 54 This court reviews motions for summary judgment de novo. Berrocal v. Fernandez, *1191 155 Wash.2d 585, 590, 121 P.3d 82 (2005). Further, this court reviews any content based speech restriction under strict scrutiny. Where a statute regulates protected speech, we view it with suspicion. "Content-based restrictions on speech are presumptively unconstitutional and are thus subject to strict scrutiny." Collier v. City of Tacoma, 121 Wash.2d 737, 748-49, 854 P.2d 1046 (1993) (citing Renton v. Playtime Theatres, Inc., 475 U.S. 41, 46-47, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986)).

ANALYSIS
1. The Statute is Facially Vague without the Saving Construction
ś 55 We begin our analysis with the language of the political committee definition statute. See former RCW 42.17.020(33). This is the central issue. If the statutory language is vague, we are bound to apply the aforementioned Buckley saving construction. Any finding that the language in the statute is imprecise, supports the VEC's arguments. The purpose of the vagueness doctrine is twofold: "`first, to provide citizens with fair warning of what conduct they must avoid; and second, to protect them from arbitrary, ad hoc, or discriminatory law enforcement.'" State v. Williams, 144 Wash.2d 197, 203, 26 P.3d 890 (2001) (quoting State v. Halstien, 122 Wash.2d 109, 116-17, 857 P.2d 270 (1993)).
ś 56 Here, the VEC convincingly argues that the average citizen has no way of knowing what conduct is prohibited by the statute. Naturally, each person's perception of what constitutes "opposing or supporting" a candidate will differ based on each person's subjective impressions. For example, if an advertisement states "Jones will cut hospital funding," the statement will be viewed as "supporting" by those who think funding should be cut but viewed as "opposing" by those who think slashing funding is wrong.
ś 57 Conversely, the majority accepts the PDC's call for a malleable definition of "support or oppose." The PDC argues that "any bright line test is unworkable . . . especially in the area of campaign ads." Am. Br. of Resp'ts (PDC) at 22. It also asserts that "exacting precision is not required in order for a person to understand what is prohibited." Id. at 19. The PDC continues to embrace a hazy standard by stating that speech regulation "is not impermissibly vague just because it may be imprecise." Id. I disagree with the PDC's argument because it is in conflict with United States Supreme Court precedent and decisions of this court.
ś 58 Freedom of speech is a bedrock principle of American constitutional jurisprudence founded in the First Amendment of the Bill of Rights (and our own constitution's article I, section 5). Any government regulation proposing speech restrictions must be clear: "[p]recision of regulation must be the touchstone in an area so closely touching our most precious freedoms." NAACP v. Button, 371 U.S. 415, 438, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963) (emphasis added); see also O'Day v. King County, 109 Wash.2d 796, 810, 749 P.2d 142 (1988) ("The Supreme Court has repeatedly emphasized that where First Amendment freedoms are at stake a greater degree of specificity and clarity of purpose is essential." (emphasis added)).
ś 59 This heightened level of specificity and clarity is required by the First Amendment and directly rebuts the PDC's broad assessment of its powers. Any limitations on political speech (even disclosure requirements) are disfavored. Id. Instead, we require a narrow and precise statute before allowing any government regulation. This court in Washington State Republican Party v. Washington State Public Disclosure Commission, 141 Wash.2d 245, 266, 4 P.3d 808 (2000) (WSRP) held that "in order to avoid vagueness and a chilling effect on political speech, Buckley requires the definition of election-related speech to be sharply drawn." In light of this instruction, we examine Washington's statutory definition of a "political committee."
ś 60 The relevant statute's "support or oppose" language is not "sharply drawn." See former RCW 42.17.020(33). Punitive laws, including disclosure requirements for political committees, must not be so vague that people "of common intelligence must necessarily guess at its meaning and differ as to its application." Connally v. Gen. Constr. *1192 Co., 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926). In other words, any right-minded person must be able to easily determine whether the "support or oppose" statutory restrictions apply. See id. This is because vagueness alone has a chilling effect on speech, intimidating some from exercising their constitutional rights. Contrary to the suggestion of the majority, if this statute encourages subjective enforcement, it should be held void for vagueness.
ś 61 The majority asserts that McConnell v. Federal Election Commission, 540 U.S. 93, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003), upheld similar statutory language ("support" and "oppose") as sufficiently precise. Majority at 1184 (arguing that "support or oppose" is "significantly more precise than the phrase `relative to a clearly identified candidate,' which the Court determined was vague in Buckley."). The majority cites McConnell to support its position, where the United States Supreme Court actually stated:
The words "promote," "oppose," "attack," and "support" clearly set forth the confines within which potential party speakers must act in order to avoid triggering the provision. These words "provide explicit standards for those who apply them" and "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited."
540 U.S. at 170 n. 64, 124 S.Ct. 619 (quoting Grayned v. City of Rockford, 408 U.S. 104, 108-09, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) (emphasis added)).
ś 62 However, the majority confuses (political) party speakers with private speakers. This distinction makes all the difference. McConnell was referring only to party speakers (such as political party operatives), and not referring to the private, independent speech at issue here. Candidates and the political parties who support them for public office may be subject to broader regulation in the interests of disclosure. By definition, they are in the business of supporting and opposing political campaigns. They are expected to know what actions "support or oppose" candidates and indeed design their ads solely for that purpose. Applying the same test to private speakers who wish to exercise their right to engage in only pure political speech, is unconstitutional. See WSRP, 141 Wash.2d at 266, 4 P.3d 808 (requiring sharply drawn regulation of political speech).
ś 63 The United States Supreme Court's most recent political speech decision dealt with an organization similar to VEC, Federal Election Commission v. Wisconsin Right to Life, Inc., ___ U.S. ___, 127 S.Ct. 2652, 168 L.Ed.2d 329 (2007) (WRTL II), featuring an as-applied challenge. I disagree with the majority's assertion that WRTL II is not germane. Clearly, we must follow the most recent pronouncement of the Court when reading the "support or oppose" language in former RCW 42.17.020(33). If VEC "supported or opposed" Ms. Senn, then it is a political committee under the statute. If not, VEC has been censored by the PDC. The precise issue in this case is whether "support or oppose" is overbroad or whether it can be saved by using a narrow, express advocacy construction. In WRTL II, the Supreme Court emphasized that:
(1) there can be no free-ranging intent-and-effect test; (2) there generally should be no discovery or inquiry into the sort of `contextual' factors highlighted by the FEC and intervenors; (3) discussion of issues cannot be banned merely because the issues might be relevant to an election; and (4) in a debatable case, the tie is resolved in favor of protecting speech.
Id. at 2669 n. 7. Thus, any determination of whether VEC is a "political committee" must be "objective, focusing on the substance of the communication," which in this case requires a rigorous, objective inquiry into the precise language used in the advertisements concerning Ms. Senn. Id. at 2666; see also former RCW 42.17.020(33). This has not been done. The majority cannot point to a particular phrase in the disputed advertisements that is "susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate." WRTL II, 127 S.Ct. at 2667. In fact, the majority can reach its conclusion only if it assumes contextual or timing factors that are disfavored by WRTL II.
*1193 ś 64 Adapting Chief Justice Roberts' words, I would hold, "Enough is enough. Issue ads like WRTL's [or VEC's] are by no means equivalent to contributions, and the quid-pro-quo corruption interest cannot justify regulating them. To equate WRTL's [or VEC's] ads with contributions is to ignore their value as political speech." Id. at 2672.
ś 65 The majority's acceptance of a vague definition would allow the PDC a tremendous amount of discretionary power over private political speech. Under this scheme, this government censor would determine the parameters of the "support or oppose" statutory language, often after the speech has taken place (when the speaker is already in violation). Speakers will be held hostage to impermissible postspeech agency decisions. See id. at 265, 4 P.3d 808 (recognizing the danger of speech regulation by a state agency). The majority's approach denies all speakers the constitutional right to craft a message that is educational, including criticism of a candidate, but not subject to disclosure requirements.[3]
A. This Court Has Previously Interpreted "Support or Oppose" Language as Vague
ś 66 Today's decision disregards other direct precedent. In Bare v. Gorton, 84 Wash.2d 380, 383-87, 526 P.2d 379 (1974), this court labeled the "support or oppose" statutory language as too vague. The Bare court considered the constitutionality of spending limits imposed by the Fair Campaign Practices Act on "election campaign" expenditures. Id. An "election campaign" was defined as "any campaign in support of or in opposition to a candidate for election to public office. . . ." LAWS of 1973, ch. 1, § 2 (Initiative No. 276, § 2(11)) (codified as RCW 42.17.020(18) (emphasis added)). This court properly identified the vagueness inherent in the statutory language:
[W]ho decides and what standards are to be used in determining whether a particular communication is for or against a proposition? Imagine an avdertisement [sic] which states "If you believe you should raise your taxes for a teacher salary increase, vote for the special levy." The act provides no standards to determine how to allocate the cost of that message as for or against the proposition.

Bare, 84 Wash.2d at 383, 526 P.2d 379 (emphasis added).
ś 67 The majority attempts to differentiate Bare because the case did not specifically consider the definition of a "political committee" but instead dealt with campaign expenditures. Majority at 1184. However, this is not a distinction that makes a difference. Buckley and McConnell are admittedly relevant to the election speech debate even though these cases are primarily about campaign finance. The underlying principles are like Bare, where this court considered similar, unclear language as applied to expenditures in an election campaign. See Bare, 84 Wash.2d at 383-87, 526 P.2d 379 (construing identical "support or oppose" language in election campaign statute former RCW 42.17.020 (1973)). Thus, the inherent vagueness of the definition is the only relevant inquiry.
ś 68 Next, the majority endeavors to distinguish Bare by splitting a grammatical hair. It asserts that the "support or oppose" language in the VEC's complaint is functionally different from the "for or against" wording in Bare. Majority at 1185. There is no meaningful distinction between the two phrases, either in application or definition. Without question, Bare was construing the limits of "election campaign" expenditures that statutorily include the vague in support of or in opposition to language. The court in Bare clearly disapproved of regulating speech language "for or against" a proposition *1194 if standards were not provided to guide the speaker. See Bare, 84 Wash.2d at 383-87, 526 P.2d 379. In the instant case, no standards were provided to the VEC.
ś 69 As if confirming the reasoning in Bare, the Washington State Legislature in 2005 replaced the unconstitutionally vague former RCW 42.17.020(33) with a new definition.[4] This latest version of the law regulates all "electioneering communications" within a certain time frame before elections. RCW 42.17.020(20).[5] The legislature's solution was an attempt to cure the vagueness of the prior version that we deal with today. The 2005 legislature attempted to cure the deficient language by echoing the federal definition of "electioneering communication" and its accompanying timeline. See 2 U.S.C. § 434(f)(3).
ś 70 Clearly, we must judge the VEC's advertisement here based on controlling law at the time of the speech. The VEC spoke under the previous version of the statute and relied on the explicit words test that we articulated in WSRP. See 141 Wash.2d at 259, 4 P.3d 808. The "support or oppose" definition was acceptable only if the saving construction from WSRP is applied. The definition is too vague if relying on the contextual definition applied by the PDC. See WSRP, 141 Wash.2d at 268-69, 4 P.3d 808 (a context approach "invites too much in the way of regulatory and judicial assessment of the meaning of political speech . . . Furgatch's context approach simply adds another layer of uncertainty, and is too flexible to be consistent with Buckley." (citations omitted)).[6]
ś 71 The majority's refusal to consistently apply WSRP gives too much deference to government regulators. Speaker VEC correctly argues that this field of prohibited speech will ultimately be determined on a case by case basis as the PDC decides to sanction unwary speakers for uttering words the agency disapproves. Am. Br. of Appellants (VEC) at 5. The PDC conclusion that the ads "malign" Ms. Senn is symptomatic, indicating PDC's disfavor of these ads. This court has recognized that bestowing such power on a state agency is fraught with peril for free speech:
This danger is especially acute when an official agency of government has been created to scrutinize the content of political expression, for such bureaucracies feed upon speech and almost ineluctably come to view unrestrained expression as a potential "evil" to be tamed, muzzled or sterilized.
WSRP, 141 Wash.2d at 265, 4 P.3d 808 (quoting Fed. Election Comm'n v. Cent. Long Island Tax Reform Immediately Comm., 616 F.2d 45, 54-55 (2d Cir.1980) (Kaufman, J., concurring)).
ś 72 This reasoning surely applies to the PDC, an executive agency appointed by the governor claiming power to regulate the sensitive area of political speech. The PDC's actions here are precisely the type considered by this prescient warning. The majority would give wide power to an agency regulating First Amendment expression (the same agency defendant in WSRP). See id.
ś 73 Following the majority's reasoning, the PDC would register or regulate every grass roots organization speaking in "support *1195 of or opposition to" any political issue as a "political committee." If one wants to urge neighbors to donate money in support of or opposition to a candidate or issue, one must first form a political committee and register with the PDC under the threat of financial penalty.[7]
ś 74 This PDC-managed restriction obviously favors large interests. If an issue detrimental to a citizen's group arises close to an election, it would be difficult to quickly advertise without incurring the wrath of the PDC. It takes time to comply with the regulations and forms necessary to form a political committee, and even more time to raise sufficient funds in the small amounts typical of neighborhood groups. The PDC's broad, overinclusive definition of a political committee will shut out newcomers and minority voices from the political process.[8]
2. Saving Construction
ś 75 A vague political speech statute is unconstitutional unless saved by a bright line statutory construction. WSRP, 141 Wash.2d at 266, 4 P.3d 808. This holding has never been overruled, and the majority does not do so. While the majority does not expressly reach the issue, I perform the following analysis because I find the statute to be facially vague. The majority's opinion acknowledges the United States Supreme Court's Buckley rule and then dismisses it, based on the later statement in McConnell that the line between express and issue advocacy in congressional campaigns is "functionally meaningless." 540 U.S. at 193, 124 S.Ct. 619; see also majority at 1186.
ś 76 The United States Supreme Court noted that this line had been drawn as a matter of statutory saving construction. After extensive hearings, Congress had subsequently adopted a new definition. Id. However, this argument does not undermine VEC's claim. The test need not be a "first principle of constitutional law" to have continuing viability. McConnell, 540 U.S. at 190, 124 S.Ct. 619; see also id. at 192 n. 75, 124 S.Ct. 619 ("[o]ur adoption of a narrowing construction [in Buckley] was consistent with our vagueness and overbreadth doctrines."). The Buckley test remains a legitimate tool of statutory construction to save an arguably vague statute.
A. Courts Continue To Affirm Buckley
ś 77 Federal courts continue to affirm that Buckley's express advocacy construction is appropriate to save otherwise unconstitutionally vague regulations of political speech. Anderson v. Spear, 356 F.3d 651, 665 (6th Cir.) (invalidating a statute that prohibited certain electioneering activity "for or against any candidate" because it was unconstitutionally vague), cert. denied, 543 U.S. 956, 125 S.Ct. 453, 160 L.Ed.2d 317 (2004). The United States Court of Appeals for the Sixth Circuit stated in relevant part:
[W]hile the McConnell Court disavowed the theory that "the First Amendment erects a rigid barrier between express advocacy and so-called issue advocacy," it nonetheless left intact the ability of courts to make distinctions between express advocacy and issue advocacy, where such distinctions are necessary to cure vagueness and overbreadth in statutes which regulate more speech than that for which the legislature has established a significant governmental interest.
Id. at 664-65 (emphasis added) (quoting McConnell, 540 U.S. at 193, 124 S.Ct. 619); see also ACLU of Nev. v. Heller, 378 F.3d 979, 985 (9th Cir.2004) (affirming the continued viability of Buckley as a saving construction).
ś 78 Likewise, in Center for Individual Freedom v. Carmouche, 449 F.3d 655, 665 (5th Cir.2006), the United States Court of Appeals for the Fifth Circuit used the Buckley *1196 standard to construe a statute that regulated campaign expenditures "supporting" or "opposing" candidates. ("McConnell does not obviate the applicability of Buckley's line-drawing exercise where, as in this case, we are confronted with a vague statute."). Id. In Freedom, the flaw in the campaign finance act was that the statute might be read to regulate issue advocacy. Id. at 665. Following McConnell, the court held that regulating such issue communications is not per se unconstitutional, but it rendered the scope of the statute as too vague. Id.
ś 79 Similarly, the federal circuit court sharply criticized the broad application of McConnell beyond the specific congressional record in that case. The Wisconsin Right to Life, Inc. v. FEC, 466 F.Supp.2d 195 (D.D.C. 2006) decision was upheld by the Supreme Court. The exemption to McConnell is relatively clear; if the ad lacks explicit words of "support or opposition" to the candidate and the ad makes no explicit reference to the election, these factors favor an exemption. Id.
ś 80 That court went on to distinguish McConnell because McConnell dealt primarily with a voluminous record of sham "issue" advertisements in congressional campaigns and is only relevant when dealing with express advocacy or its functional equivalent. See, e.g., WRTL II. Here, the as-applied challenge required the court to look at the language (not the intent or timing) of this specific advertisement.
B. This Court's Precedent Properly Incorporates the Buckley Test
ś 81 This court considered the approach that the PDC now advocates and explicitly rejected it, concluding that "the context approach departs from the bright-line express advocacy test of Buckley." WSRP, 141 Wash.2d at 269, 4 P.3d 808. The VEC depended on this court's holding when it published these ads. Under this court's decision, only specific language triggers the specter of prior government regulation. Id. Today's majority opinion substitutes a new standard for this previously well-considered protection.
ś 82 Any speaker in Washington State should be able to rely on this court's precedent in exercising constitutional rights. If we approve any changing standard from that of WSRP, which was the controlling law at the time of VEC's advertisement, we are guilty of chilling speech. In the future, speakers will fear that they cannot rely on this court's decisions and that future state enforcement may be determined and applied retroactively to political speech once considered safe.
3. Washington State Constitution
ś 83 Constitutional protection of individual political speech is paramount under the Washington Constitution, no matter how slight the government intrusion. Registration and disclosure requirements on political speech are, by definition, content based restrictions that are subject to a strict scrutiny review. See Collier, 121 Wash.2d at 748-49, 854 P.2d 1046. Strict scrutiny requires a statute be narrowly tailored to serve a compelling state interest. This presumption against any regulation of political speech is vitally important. Contrast the PDC's increasingly complex web of speech regulation (changing rules, forms, opinions, etc.) against the relatively simple constitutional admonition (which applies to states): "Congress shall make no law . . . abridging the freedom of speech. . . ." U.S. CONST. amend. I (emphasis added).
ś 84 The Washington State Constitution explicitly provides more protection to speech than the federal constitution. Ino Ino, Inc. v. City of Bellevue, 132 Wash.2d 103, 116-17, 937 P.2d 154, 943 P.2d 1358 (1997). Article I, section 5 of the Washington Constitution provides that "[e]very person may freely speak, write and publish on all subjects, being responsible for the abuse of that right." Establishing protection under some sections of the Washington State Constitution often involve a Gunwall analysis[9] to show the protection *1197 differs from that of the United States Constitution. However, no such analysis is necessary here because the relevant broader protection for speech has already been established by this court.[10]See State v. Vrieling, 144 Wash.2d 489, 495, 28 P.3d 762 (2001).
ś 85 Unlike its federal counterpart, article I, section 5 strictly prohibits prior restraints on free speech. Ino Ino, 132 Wash.2d at 119, 937 P.2d 154. This includes prohibition of any requirement of prior registration to engage in speech. See id. In regard to claims of overbreadth and vagueness, the text of article I, section 5 is less tolerant than the First Amendment of overbroad restrictions on expression when such restrictions rise to the level of a prior restraint. O'Day v. King County, 109 Wash.2d 796, 804, 749 P.2d 142 (1988).
ś 86 The Washington Constitution "absolutely forbids prior restraints against the publication or broadcast of constitutionally protected speech" where "the information sought to be restrained was lawfully obtained, true, and a matter of public record." State v. Coe, 101 Wash.2d 364, 375, 679 P.2d 353 (1984). In the present case, VEC's speech is clearly lawfully obtained information, it was true, and a matter of public record (it was an amalgam of public record newspaper articles). Majority at 1177-78. Thus, restricting publication through disclosure requirements becomes a prior restraint. Another indication that this vague statute operates as a prior restraint is the evidence that the speaker had no clear test to determine this particular speech required prior registration. See Coe, 101 Wash.2d at 375, 679 P.2d 353.
ś 87 In order to survive strict scrutiny, the majority must show the regulation satisfies a compelling state interest and is narrowly tailored. The majority argues that the government has an important interest in ferreting out corruption and influence peddling within the political process. See State v. (1972) Dan J. Evans Campaign Comm., 86 Wash.2d 503, 508, 546 P.2d 75 (1976). The majority also contends that these interests are "`sufficiently important to outweigh the possibility of infringement.'" Majority at 1181 (quoting Buckley, 424 U.S. at 66, 96 S.Ct. 612). Distressingly, there is no evidence to support the claim that this private speech triggered any compelling state interest. There is no suggestion of corruption or influence peddling.
ś 88 In contrast with the majority, I also disagree that disclosure requirements are automatically the least restrictive alternative. See majority at 1181. In some cases, even anonymous political speech may be a necessary shield to protect private speakers. Anonymity sometimes protects unpopular individuals and voices from retaliation and suppression by an intolerant majority.[11] Allowing robust anonymous speech in the political arena, encourages writers to freely express ideas without fear of retaliation.[12] Unfortunately, the majority's ruling ensures *1198 that critics of popular candidates cannot use this method of expression, and disclosure requirements will temper any advocacy of unpopular opinions.
ś 89 Conversely, the majority argues that disclosure requirements imposed in this case ultimately allow the speech to continue and are therefore a narrowly tailored imposition on the VEC's constitutional right to free speech.[13]See majority at 1187. This analysis misses the crux of the issue. Buckley held that disclosure requirements "can seriously infringe on privacy of association and belief guaranteed by the First Amendment" and that such requirements are subject to "exacting scrutiny." 424 U.S. at 64, 96 S.Ct. 612.
ś 90 In short, any speaker must know beforehand which speech is regulated, regardless of the penalty. Here, a speaker could choose many words which might run afoul of the "support or oppose" regulation as construed by the PDC. We should not let a government censor or subjectively decide which speech is penalized and which is not.
4. Attorney Fees
ś 91 Pursuant to RAP 18.1, we should grant the VEC's request that the court award it reasonable attorney fees and expenses under 42 U.S.C. § 1988.

CONCLUSION
ś 92 The majority opinion leaves troubling questions about what governmental regulation of political speech the majority finds constitutionally permissible. If VEC had quoted the newspaper articles verbatim rather than voice over the headlines, must it register before speaking? Answer: Ask the PDC. What if VEC had copied and distributed entire newspaper articles, must it register before speaking? Answer: Ask the PDC. This is the wrong answer under both the United States and Washington Constitutions. A speaker need not ask a government agencyâ or register with the governmentâ before engaging in political speech. Under the majority decision, it is not clear where constitutionally protected criticism ends and the PDC's regulatory power begins. The protections of the First Amendment, and of our Washington Constitution article I, section 5, are violated. Thus, I respectfully dissent.
I CONCUR: RICHARD B. SANDERS, Justice.
NOTES
[1] This opinion refers collectively to all of the appellants, including the Voters Education Committee, Bruce Boram, and Valerie Huntsberry, as VEC.
[2] This opinion refers collectively to all of the respondents, including the Washington State Public Disclosure Commission, Michael Connelly, Jeanette Wood, Francis Martin, Earl Tilly, Jane Noland, Vicki Rippie, and Christine Gregoire, as the PDC.
[3] A second television advertisement sponsored by VEC, entitled "New," aired during the same time period as "Better." The PDC did not include "New" in its enforcement proceedings against VEC. As a result, "New" is not pertinent to this case.
[4] The dissent claims that the PDC, based on its "subjective designation" that VEC's advertisement "was `malign[ing]' Ms. Senn's character" "labeled [VEC] a `political committee'" and subjected it to "prior registration and disclosure requirements." Dissent at 1190 (first alteration in original). The dissent's characterization of the regulations at issue here as the "prior registration and disclosure requirements" is inaccurate. Id. (emphasis added); see discussion, infra, at 1187.

Moreover, as this excerpt from the PDC's letter to VEC reveals, the PDC's conduct was hardly as whimsical as the dissent seems to imply:
After reviewing a broadcast advertisement of [VEC], PDC staff has concluded that the ad is "express advocacy" as that term is used in . . . Washington State Republican Party v. Washington State Public Disclosure Commission et al., 141 Wash.2d 245, 4 P.3d 808 (July 27, 2000). When advertising maligns a candidate's character, it is "express advocacy." As such, the activities of [VEC] are reportable to the [PDC] under chapter 42.17 RCW.
CP at 611.
[5] The trial court also granted partial summary judgment for the PDC in PDC v. VEC, the PDC's enforcement case. The trial court has not yet proceeded to the remedy phase in that case. Although VEC also filed a motion for discretionary review in PDC v. VEC, No. 77725-0 in this court, VEC withdrew its motion after the parties stipulated to a stay of proceedings in the trial court, pending the outcome in this case.
[6] Recent amendments to the FCPA have likely altered the requirement that only a political committee must disclose its contributions and expenditures to the PDC. RCW 42.17.565 now requires the sponsor of electioneering communications to report the sponsor's identity to the PDC and to disclose information about its contributions and expenditures. The legislature also amended RCW 42.17.020 to include a new definition of "`[e]lectioneering communication.'" Laws of 2005, ch. 445, § 6. The definition of "`[e]lectioneering communication'" now includes:

[A]ny broadcast, cable, or satellite television or radio transmission . . . that:
(a) Clearly identifies a candidate for a state, local, or judicial office either by specifically naming the candidate, or identifying the candidate without using the candidate's name;
(b) Is broadcast, transmitted, mailed, erected, distributed, or otherwise published within sixty days before any election for that office in the jurisdiction in which the candidate is seeking election; and
(c) Either alone, or in combination with one or more communications identifying the candidate by the same sponsor during the sixty days before an election, has a fair market value of five thousand dollars or more.
RCW 42.17.020(20). As a result, the definition of "political committee" is no longer the sole determining factor of whether the sponsor of a political advertisement must disclose contribution and expenditure information to the PDC.
[7] The dissent states, "[d]istressingly, there is no evidence to support the claim that [VEC's] private speech triggered any compelling state interest. There is no suggestion of corruption or influence peddling." Dissent at 1197. Contrary to the dissent's implication, there need be no evidence of corruption on VEC's part to find that the FCPA registration and disclosure regulations promote a compelling government interest in deterring corruption and the appearance of corruption.
[8] Recently the United States Supreme Court handed down Federal Election Commission v. Wisconsin Right to Life, Inc., ___ U.S. ___, 127 S.Ct. 2652, 168 L.Ed.2d 329 (2007) (WRTL II), its "most recent political speech decision." Dissent at 1192. Although the dissent discusses WRTL II at length, see dissent at 1192-93, WRTL II does not apply to the issue of vagueness on which this case is decided.

WRTL II involves an as-applied challenge to section 203 of BCRA, 2 U.S.C. § 441b(b)(2), which prohibits corporations and unions from using general treasury funds to finance "electioneering communications." McConnell, in a different section than is discussed in the text above, held that section 203 was facially constitutional to the extent that the electioneering communications were express advocacy or the "functional equivalent of express advocacy." McConnell, 540 U.S. at 206, 124 S.Ct. 619. Subsequently, the Court determined that, in so holding, McConnell did not preclude an as-applied challenge to section 203. Wisconsin Right to Life, Inc. v. Fed. Election Comm'n, 546 U.S. 410, 411-12, 126 S.Ct. 1016, 163 L.Ed.2d 990 (2006) (WRTL I).
WRTL II addressed such an as-applied challenge. In the controlling opinion, Chief Justice Roberts, joined by Justice Alito, announced that an advertisement "is the functional equivalent of express advocacy only if the ad is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate." WRTL II, 127 S.Ct. at 2667. Applying this test, Chief Justice Roberts determined that Wisconsin Right to Life's advertisements, extolling voters to contact their senators to urge an end to a filibuster, were not the functional equivalent of express advocacy and therefore "f[e]ll outside the scope of McConnell's holding." Id. at 2670.
While WRTL II departs from McConnell's approach to express advocacy and issue advocacy, that departure is not germane to this case. The issue we address here is whether the phrase "in support of, or opposition to, any candidate" in the definition of "`political committee'" is vague. Former RCW 42.17.020(33). That analysis is unaffected by the Court's decision in WRTL II.
[9] The dissent argues that McConnell provides no guidance here because it "refer[s] only to party speakers," not "private, independent speech." Dissent at 1192. But unlike the political party-specific statutes that are the primary focus of the McConnell decision, see, e.g., 540 U.S. at 161-73, 124 S.Ct. 619 (addressing restrictions on state and local party committees), in note 64 the Court rejects a vagueness challenge to the definition of "[f]ederal election activity," 2 U.S.C. § 431(20)(A)(iii), a provision that is not limited to party speakers. The Court upheld as sufficiently precise to satisfy First Amendment concerns the definition of "[f]ederal election activity" to mean "a public communication that refers to a clearly identified candidate for Federal office . . . and that promotes or supports a candidate for that office, or attacks or opposes a candidate for that office (regardless of whether the communication expressly advocates a vote for or against a candidate)." 2 U.S.C. § 431(20)(A)(iii) (emphasis added); see also McConnell, 540 U.S. at 170 n. 64, 124 S.Ct. 619. Thus, the Court's considered endorsement of the terms "supports" and "opposes" provides relevant guidance on the matter before us.
[10] Nor, contrary to the dissent's claim, did the Bare court "constru[e] identical `support or oppose' language in election campaign statute former RCW 42.17.020 (1973)." Dissent at 1193. The definition of "`[e]lection campaign'" does include "in support of or in opposition to" language paralleling that used in the definition of "`[p]olitical committee.'" Former RCW 42.17.020(11), (22) (1973). However, the Bare court did not directly construe that "election campaign" definition, as evidenced by the fact that the phrase "in support of, or in opposition to" appears nowhere in the Bare decision.
[11] We reject the suggestion that Bare's use of the phrase "for or against" while discussing one factor that contributed to former RCW 42.17.140's unconstitutional vagueness is functionally equivalent to a judicial determination that the phrase "in support of or in opposition to" is itself unconstitutionally vague. Dissent at 1193. Contrary to the dissent's assertion, a meaningful distinction can be drawn between using "for or against" while analyzing a statute that does not include "in support of or in opposition to" and analyzing "in support of or in opposition to" directly.
[12] The dissent faults our analysis of "Better," stating that it does not "point to a particular phrase . . . that is `susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate.'" Dissent at 1192 (quoting WRTL II, 127 S.Ct. at 2667). However, determining whether VEC constituted a "political committee" when it ran "Better" does not involve applying the WRTL II standard for the functional equivalent of express advocacy that the dissent quotes. See note 8, supra.
[13] Deborah Senn was elected to the office of insurance commissioner in 1992, reelected in 1996, and served through 2000.
[14] Moreover, as CLC observes, VEC "is registered as a Section 527 political organization under the Internal Revenue Code." CP at 4. A section 527 "`political organization'" must be "organized and operated primarily for the purpose of directly or indirectly accepting contributions or making expenditures . . . for . . . the function of influencing or attempting to influence the selection, nomination, election, or appointment of any individual to any Federal, State, or local public office." 26 U.S.C. § 527(e)(1)-(2). As VEC notes, the definition of "political organization" in section 527 does have a broader sweep than does the definition of "`[p]olitical committee'" in former RCW 42.17.020(33). However, VEC fails to justify how it qualifies as a "political organization" but not a "political committee." Thus, the fact that VEC registered as a "political organization" under section 527 organization is a persuasive fact that indicates that VEC was seeking the tax benefits of section 527 while disingenuously seeking to avoid the disclosure requirements of the FCPA.
[15] When presented with arguments under both the Washington and federal Constitutions, this court usually reviews the state constitutional arguments first. State v. Reece, 110 Wash.2d 766, 770, 757 P.2d 947 (1988). However, because federal First Amendment analysis provides an important background for reviewing regulations of political speech, we follow the organizational structure of the parties and consider the federal constitutional arguments first. See Am. Br. of Appellants at 12 n. 6 (citing Reece, 110 Wash.2d at 770-71, 757 P.2d 947).
[16] When presented with a claim that a provision of the Washington Constitution provides greater protection than is provided under a provision of the United States Constitution, this court engages in a two step inquiry. First we determine whether the state provision should be given an independent interpretation from the federal provision by analyzing the six nonexclusive, neutral Gunwall factors. State v. McKinney, 148 Wash.2d 20, 26, 60 P.3d 46 (2002) (citing State v. Gunwall, 106 Wash.2d 54, 720 P.2d 808 (1986)). Where, as here, our precedent establishes that a separate and independent analysis of a state constitutional provision is warranted, further Gunwall analysis is unnecessary to establish that point. If we determine that an independent analysis is warranted, we then analyze "whether the provision in question extends greater protections for the citizens of this state." Id.
[17] The dissent engages in a lengthy discussion of the Washington Constitution's prohibition against prior restraints but fails to demonstrate that a prior restraint occurred in this case. Dissent at 1196-98. The dissent's reliance on State v. Coe, 101 Wash.2d 364, 679 P.2d 353 (1984), in this regard is misplaced. As the dissent notes, Coe does establish that "[t]he Washington Constitution 'absolutely forbids prior restraints against the publication or broadcast of constitutionally protected speech' where `the information sought to be restrained was lawfully obtained, true, and a matter of public record.'" Dissent at 1197 (quoting Coe, 101 Wash.2d at 375, 679 P.2d 353). However, the dissent's assertion that "VEC's speech is clearly lawfully obtained information," "true, and a matter of public record" does not prove that therefore "restricting publication through disclosure requirements becomes a prior restraint." Id. at 1197. This is a faulty syllogism, akin to asserting (1) all men are mortal, (2) the cat is mortal, (3) therefore the cat is a man.

As explained above, because the FCPA registration and disclosure requirements did not impose a prior restraint on VEC's speech, the Washington Constitution's prohibition on prior restraints is inapposite.
[1] Here, the Voters Education Committee (VEC) faced substantial financial penalties from its exercise of political speech, stemming from its failure to register with the government before speaking. Disclosure requirements are, at their core, content-based regulations dealing with election speech. "A statute is presumptively inconsistent with the First Amendment if it imposes a financial burden on speakers because of the content of their speech." Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd., 502 U.S. 105, 115, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991) (citing Leathers v. Medlock, 499 U.S. 439, 447, 111 S.Ct. 1438, 113 L.Ed.2d 494 (1991)).
[2] The television advertisement at issue included voice-over narration in combination with on-screen text and images of newspaper headlines.

Text on black background: "Who is Deborah Senn looking out for?"
Text with image of money: "Suspended Most of $700,000 Fine Source: Seattle Times 2/20/97"
Text with image of Insurance Commissioner's office: "In Exchange for New Staff in Her Office Source: Seattle Times 2/20/97"
Text with image of Washington State Capital: "Tried to Cover Up Deal from State Legislators Source: Seattle Times 2/20/97"
Text with image of newspaper, Seattle Post-Intelligencer banner head: "`. . . easily could lead to conflict-of-interest abuses.' 2/27/97"
Text on black background:
"Deborah Senn Let Us Down
Learn More About the Insurance Crisis www.senninsurancecrisis.com
Paid for by Voters Education Committee."
Decl. of Vicki Rippie (Sept. 10, 2004), attach. E (videotape of KIRO TV Sept. 4, 2004, advertisement); majority at 1177-78.
The script of the voice-over narration read:
Who is Deborah Senn looking out for?
As Insurance Commissioner, Senn suspended most of a $700,000 fine against an insurance company . . . in exchange for the company's agreement to pay for four new staff members in Senn's own office.
Senn even tried to cover up the deal from State Legislators.
The Seattle Post Intelligencer said Senn's actions "easily could lead to conflict-of-interest abuses."
Deborah Senn let us down . . . log on to learn more.
Paid for by Voters Education Committee."
Clerk's Papers (CP) at 51; majority at 1177-78.
[3] Any determination that speech is "opposing" a particular candidate is flawed unless it considers the actual language in the advertisement. The majority did not perform this analysis. This court recognized the difference between analyzing actionable speech and conclusory labeling in Suggs. "Labeling certain types of speech `unprotected' is easy. Determining whether specific instances of speech actually fall within `unprotected' areas of speech is much more difficult." In re Marriage of Suggs, 152 Wash.2d 74, 82, 93 P.3d 161 (2004). Here, the majority shirked the task of struggling with the actual wording in the VEC advertisement. Instead, it made the blanket determination that the words were actionable per se.
[4] C.f., Wisconsin Right to Life, discussed supra.
[5] The new statute, RCW 42.17.020(20), states that regulated electioneering communications include:

[A]ny broadcast, cable, or satellite television or radio transmission . . . that:
(a) Clearly identifies a candidate for a state, local, or judicial office either by specifically naming the candidate, or identifying the candidate without using the candidate's name;
(b) Is broadcast, transmitted, mailed, erected, distributed, or otherwise published within sixty days before any election for that office in the jurisdiction in which the candidate is seeking election; and
(c) Either alone, or in combination with one or more communications identifying the candidate by the same sponsor during the sixty days before an election, has a fair market value of five thousand dollars or more.
(Emphasis added.) This newest legislation has not yet been subject to court scrutiny.
[6] FEC v. Furgatch, 807 F.2d 857, 864 (9th Cir. 1987) (context analysis that "must, when read as a whole, and with limited reference to external events, be susceptible of no other reasonable interpretation but as an exhortation to vote for or against a specific candidate" (emphasis added)).
[7] Recently, there was a hastily scheduled advisory election regarding highway construction through Seattle. See Bob Young, Political Campaign Heats Up Over Viaduct, SEATTLE TIMES, Feb. 13, 2007 (concerning the Alaskan Way Viaduct referendum vote on March 13, 2007). Do low budget citizen advocacy groups have to go through the process to register with the PDC before speaking? Only the PDC knows for sure. It is clear that citizen's groups will be at a significant disadvantage to groups which have already registered as "political committees."
[8] PDC enforcement action, or its threat, serves as a separate deterrent to speech.
[9] State v. Gunwall, 106 Wash.2d 54, 720 P.2d 808 (1986).
[10] E.g., this court has repeatedly held that any broad regulation that rises to the level of a prior restraint is prohibited. See Ino Ino, 132 Wash.2d at 116-17, 937 P.2d 154.
[11] Four decisions of the Supreme Court hold or strongly imply that the ability to speak anonymouslyâ and thus with less concern for repercussionsâ is part of the "freedom of speech" protected by the First Amendment against governmental interference. Talley v. California, 362 U.S. 60, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960); McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995); Buckley v. Am. Constitutional Law Found., 525 U.S. 182, 199-200, 119 S.Ct. 636, 142 L.Ed.2d 599 (1999); Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton, 536 U.S. 150, 166-67, 122 S.Ct. 2080, 153 L.Ed.2d 205 (2002). See Jonathan Turley, Registering Publius: The Supreme Court and the Right to Anonymity, Cato Sup.Ct. Rev. 57 (2001-02).
[12] Anonymous speech also ensures that ideas will be judged on their merits: "[W]e must consider the possibility that anonymity promotes a focus on the strength of the argument rather than the identity of the speaker; this is a reason why Madison, Hamilton, and Jay chose to publish The Federalist anonymously. Instead of having to persuade New Yorkers that his roots in Virginia should be overlooked, Madison could present the arguments and let the reader evaluate them on merit." Majors v. Abell, 361 F.3d 349, 357 (7th Cir.2004) (Easterbrook, J., dubitante).
[13] The majority misconstrues the right of the public to receive information through government regulation with the right of the public to receive information unhindered by excessive government regulation. See Fritz v. Gorton, 83 Wash.2d 275, 296, 517 P.2d 911 (1974). In that case, the court held that more information about the candidates themselves is desirable because it allows voters to make an informed decision. See id. Notably, this process is best accomplished by robust criticism of political candidates, similar to the VEC's speech in the instant case. Id. ("factors that may influence the electorate's evaluative processes are not always disclosed in the heat of a campaign and less often when the official has taken office."). See majority at 1180-81.